SUSMAN GODFREY L.L.P.
Marc M. Seltzer (54534)
Krysta Kauble Pachman (280951)
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel.: (310) 789-3100
Fax.: (310) 789-3150
mseltzer@susmangodfrey.com
kpachman@susmangodfrey.com

ENTWISTLE & CAPPUCCI LLP
Vincent R. Cappucci
(*Pro Hac Vice Forthcoming*)
230 Park Avenue, 3rd Floor
New York, NY 10169
Tel.: (212) 894-7200
vcappucci@entwistle-law.com

*Counsel for Plaintiff and the Proposed Class*

*[Additional counsel listed on signature page]*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| SM MERGER/ARBITRAGE, L.P., on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SKECHERS U.S.A., INC., ROBERT GREENBERG, MICHAEL GREENBERG, JOHN VANDEMORE, DAVID WEINBERG, KATHERINE BLAIR, MORTON ERLICH, ZULEMA GARCIA, YOLANDA MACIAS, RICHARD SISKIND, ALEXANDRE BEHRING, DANIEL SCHWARTZ, 3G CAPITAL PARTNERS L.P., 3G FUND VI, L.P., ZAHID AHMED, and GREENHILL & CO., LLC,<br><br>Defendants. | Case No. 2:26-cv-12327<br><br>**CLASS ACTION**<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>**DEMAND FOR JURY TRIAL**<br><br>REDACTED |

TABLE OF CONTENTS


I. NATURE OF THE ACTION ..... 3

II. JURISDICTION AND VENUE ..... 8

III. PARTIES ..... 9

- A. Plaintiff ..... 9
- B. Defendants ..... 9
  - 1. Skechers ..... 9
  - 2. The Officer Defendants ..... 10
    - a. Robert Greenberg ..... 10
    - b. Michael Greenberg ..... 11
    - c. David Weinberg ..... 12
    - d. John Vandemore ..... 12
  - 3. The Independent Committee Defendants ..... 12
  - 4. The 3G Capital Defendants ..... 14
  - 5. The Greenhill Defendants ..... 14

IV. OVERVIEW OF THE FRAUD ..... 15

- A. Skechers is Formed and Controlled by Robert and Michael Greenberg ..... 15
- B. 3G Capital Initiates Discussions with the Officer Defendants ..... 16
- C. The Officer Defendants Provide 3G Capital with Skechers' Ordinary Course Financial Projections ..... 18
- D. 3G Capital Makes Initial Offers to Acquire Skechers and the Officer Defendants Make a Counteroffer ..... 20
- E. Greenhill is Instructed to Disregard Other Strategic Transaction Alternatives That Were Not Disclosed ..... 23
- F. The Skechers Board is Finally Notified About Negotiations With 3G Capital ..... 24
- G. The Officer Defendants Assure 3G Capital that the Escalating U.S.-China Tariffs Would Have Minimal Impact on Skechers' Business ..... 25
- H. 3G Capital Makes its Final Offer ..... 28

I. Greenhill is Formally Retained After Already Working on the Take-Private for a Month ..... 29

J. Skechers Withdraws its 2025 Guidance and its Financial Projections Are Artificially Lowered to Support 3G Capital's Final Offer ..... 30

K. The Independent Committee is Formed Only Four Days Before the Take-Private is Approved and Greenhill Presents the Lowered Skechers' Valuation to the Board ..... 35

L. The Board and Independent Committee Recommend Approval of the Take-Private and the Skechers Defendants File the Information Statement ..... 37

M. The Take-Private Closes, and the Greenbergs Receive Enormous Personal Compensation Under the Transaction ..... 38

V. THE SKECHERS DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ..... 39

A. The Skechers Defendants Misstated the Reason for the Withdrawal of the Company's 2025 Financial Guidance ..... 39

B. The Skechers Defendants Falsely Asserted the Take-Private Was Fair ..... 41

C. The Skechers Defendants' Statements Concerning the Mixed Merger Consideration Were Misleading Half-Truths ..... 47

D. The Skechers Defendants Misrepresented the Impact of Trade Tariffs on the Company's Business and Take-Private Negotiations ..... 48

E. The Skechers Defendants Statements Concerning Strategic Alternatives and the Market Check Were Misleading ..... 52

VI. ADDITIONAL ALLEGATIONS OF SCIENTER ..... 54

VII. PRESUMPTION OF RELIANCE ..... 59

VIII. LOSS CAUSATION ..... 61

IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ..... 65

X. CLASS ACTION ALLEGATIONS ..... 66

XI. CLAIMS FOR RELIEF ..... 67

COUNT I For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5(b) Against the Skechers Defendants ..... 67

COUNT II For Violation of §20(a) of the Exchange Act Against the Officer Defendants ........ 70

COUNT III For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5(a) and (c) (Scheme Liability) Against the Officer Defendants, Behring, Schwartz, 3G Capital Partners L.P., 3G Fund VI, L.P., Ahmed and Greenhill ........ 71

COUNT IV For Violation of §20(a) of the Exchange Act Against Behring and Schwartz ........ 73

XII. PRAYER FOR RELIEF ........ 75

Plaintiff SM Merger/Arbitrage, L.P. ("Plaintiff"), by and through its undersigned counsel, brings this action ("Action") on behalf of itself and a class of investors (the "Class") who sold shares of Class A common stock of Skechers U.S.A., Inc. ("Skechers" or the "Company") from April 24, 2025 through the closing of the take-private acquisition of Skechers (the "Take-Private" or "Merger") by 3G Capital Partners L.P. and its affiliates ("3G Capital") on September 12, 2025 (the "Class Period"), including investors who sold their Class A common stock into the Take-Private, and excluding certain insider shareholders as detailed below.

The subject claims are brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rules 10b-5(a)-(c), 17 C.F.R. § 240.10b-5(a)-(c), and this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa. The claims are asserted against (i) Skechers, (ii) Skechers' Chief Executive Officer ("CEO") and Chairman of the Skechers board of directors (the "Board"), Robert Greenberg, (iii) Skechers' President and Board member, Michael Greenberg, (iv) Skechers' Chief Operating Officer and Board member, David Weinberg, (v) Skechers' Chief Financial Officer, John Vandemore, (vi) Katherine Blair, Morton Erlich, Zulema Garcia, Yolanda Macias and Richard Siskind, each a member of the Skechers Board and of the Independent Committee formed to approve the Take-Private (collectively, the "Skechers Defendants"), (vii) 3G Capital Partners L.P., an investment firm that schemed to take Skechers private at an unfair and deflated price, (viii) 3G Fund VI, L.P., an affiliate of investment funds managed by 3G Capital Partners L.P. through which the Take-Private was effected, (ix) Alexandre Behring, a co-founder and co-managing partner of 3G Capital, (x) Daniel Schwartz, a co-managing partner of 3G Capital, (xi) Greenhill & Co., LLC, the financial advisor to the Skechers Board in connection with the negotiation of the Take-

Private, and (xii) Zahid Ahmed, a Managing Director at Greenhill who was the lead relationship banker advising on the Take-Private (collectively, "Defendants").

Plaintiff's claims are based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on, among other things, the independent investigation of its undersigned counsel. This investigation included, but was not limited to, a review and analysis of:

(i) Skechers' public filings with the SEC;

(ii) Defendants' public statements concerning the Take-Private made during the Class Period, including the Company's information statement on the Take-Private filed with the SEC pursuant to Section 14(c) of the Exchange Act and distributed to Skechers shareholders on August 5, 2025 (the "Information Statement");

(iii) Company press releases, reports and postings concerning the Take-Private on Skechers' website;

(iv) Media reports concerning Skechers, 3G Capital and the Take-Private;

(v) Data reflecting the price of Skechers' Class A common stock;

(vi) The filings in the consolidated case captioned *In re Skechers Class Action Merger Litigation*, Consolidated C.A. No. 2025-1281-LWW (Del. Ch.); and

(vii) Additional material and data concerning Skechers and the other Defendants.

Plaintiff's investigation is ongoing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiff believes that substantial additional evidentiary support exists for the allegations in this complaint (the "Complaint") which will become known to it after a reasonable opportunity for discovery is permitted.

## I. NATURE OF THE ACTION

1. This case involves a securities fraud orchestrated by the most senior executives of the footwear and apparel company, Skechers, in connection with its $9.4 billion Take-Private acquisition by 3G Capital Partners L.P. ("3G Capital") that closed on September 12, 2025.

2. The fraudulent scheme was devised by Skechers' inside management, *i.e.*, Skechers' founder and CEO Robert Greenberg, Company President Michael Greenberg, Chief Operating Officer David Weinberg, and Chief Financial Officer John Vandemore (the "Officer Defendants"), and executed with the assistance of 3G Capital and Skechers' financial advisor Greenhill & Co., LLC ("Greenhill"). The Officer Defendants' core objective in negotiating the Take-Private with 3G Capital was to buy out unaffiliated minority shareholders at an artificially depressed buyout price of $63 per share of Skechers Class A common stock (the "Merger Consideration"), while reaping enormous profits for themselves and their family members, and maintaining their senior positions with the Company following the Take-Private.

3. The Take-Private involved a dual-consideration structure that Defendants Robert and Michael Greenberg used to obtain their windfall profits while retaining their ownership stake and significant ongoing control of the post-transaction private Company. Public shareholders were funneled into receiving the underpriced Merger Consideration that served to artificially deflate the price of Skechers Class A common stock during the Class Period. In contrast, the Greenbergs took advantage of the alternate consideration option offered to legacy shareholders under the Take-Private, through which they received $57 per share in cash plus one equity unit per share in the post-closing private entity, with an expected per unit capital contribution amount of $29, a nominal total of $86 per share (the "Mixed Merger Consideration"). This allowed the Greenbergs to receive

over $1 billion in cash proceeds from 3G Capital while maintaining their economic interest in the business by rolling over more than 18 million shares into the private units of the new Skechers Limited Liability Company.

4. 3G Capital was willing and able to provide this windfall to the Greenbergs in exchange for their agreement to Take-Private terms that provided unfairly low consideration to Skechers' public shareholders. The scheme would only work if investors were deceived into believing that they were receiving fair value for their shares, either when exchanged in the Take-Private at the agreed price, or in open-market sales prior to the Take-Private.

5. In order to deceive investors, the Officer Defendants overstated the impact on Skechers' business of changes to tariff rates shortly before announcing the Take-Private, manipulated internal Company financial projections downward to obtain a valuation that aligned with 3G Capital's "best-and-final" cash offer of $63 per share, pushed the transaction through a rushed cursory review by a committee of the Company's Board (the "Independent Committee," and, collectively with Skechers and the Officer Defendants, the "Skechers Defendants"), concealed material information regarding the higher value of alternative consideration available to shareholders and, after announcing the Take-Private, issued a false and misleading Information Statement regarding the Take-Private.

6. Between April 23 and April 27, 2025, the Officer Defendants fraudulently manipulated Skechers' financial projections downward three separate times in order to falsely portray the Merger Consideration as fair. Each successive set of projections was lowered from the ordinary course projections Skechers had prepared before 3G Capital made its final offer. Defendant Greenhill, the financial advisor to the Skechers Board, was complicit in the fraudulent scheme. Among other things, Greenhill knowingly used the lowered projections in its fairness evaluation of the Take-Private. Greenhill's Discounted Cash Flow ("DCF")

analyses based on the first set of adjusted projections (*i.e.*, the "LRP1 Projections") [redacted]. Yet, the final set of projections provided to Greenhill and presented to public shareholders in the Information Statement resulted in a midpoint value of ***$59.90 per share*** [redacted], making the Merger Consideration appear beneficial to such shareholders. When touting the Take-Private as "fair to and in the best interests of" Skechers shareholders, the Skechers Defendants failed to disclose that the Company's financial projections had been deliberately lowered to align with the Merger Consideration, or that Greenhill had calculated per share equity values that exceeded the Merger Consideration based on the LRP1 Projections. Greenhill facilitated this deception by using the lowered projections to justify its fairness opinion (the "Fairness Opinion") that did not account for the prior, more accurate data that had been provided to it.

7. While the Officer Defendants were scheming with Greenhill to falsify Skechers' internal projections to justify the unfairly low price 3G Capital was offering to pay the public shareholders, on April 24, 2025, Skechers publicly withdrew its 2025 financial guidance to investors. This withdrawal was done to deflate the price of Skechers' publicly traded stock and justify the forthcoming announcement of the Take-Private at a low price. The Skechers Defendants falsely conveyed that the guidance was withdrawn due to macroeconomic conditions, particularly changes in global trade policies. This falsehood concealed the real reason for the withdrawal of guidance, and stoked market fears about the impact of tariffs on Skechers' business, further deflating the price, despite the fact that Skechers internally viewed the potential impact of tariffs on its business as minimal, and potentially positive.

8. The Skechers Defendants then falsely represented in the Information Statement that the Take-Private and Merger Consideration were "***fair to and in the best interests of Skechers and its stockholders***."[1] This statement was fundamentally false as Defendants omitted material facts demonstrating that the Merger Consideration understated the fair value of the Company and the Skechers stock public shareholders owned. Undisclosed to public shareholders, the Officer Defendants adjusted the Company's financial projections for 2025 through 2029 downward several times ***after*** 3G Capital made its final April 13, 2025 offer for $63 per share in order to more closely match the Merger price and ensure their receipt of the more lucrative Mixed Merger Consideration. These revised projections significantly lowered the Company's expected revenue growth and contradicted the ordinary course projections in place just before 3G Capital's final offer.

9. In the Information Statement, the Skechers Defendants again identified the escalating trade tariffs between the U.S. and China in early 2025 as posing "***a significant risk to Skechers' business operations***" going forward. In the "Background of the Transaction" section of the Information Statement, the Skechers Defendants also stated that 3G Capital was concerned about the impact the U.S.-China trade war would have on Skechers' future financial prospects. This falsely suggested that 3G Capital and Skechers management agreed to a lower Merger Consideration in response to the tariffs.

10. Undisclosed to public shareholders, the Officer Defendants had privately assured 3G Capital that the tariffs would have minimal impact on Skechers' future operational and revenue growth. These assurances were shared with 3G Capital's Investment Committee responsible for greenlighting the Take-Private for 3G Capital. For example, [redacted]

[1] All emphasis herein is added unless otherwise noted.

[redacted] (emphasis in original). Another presentation further noted that the [redacted] and [redacted] Unaffiliated shareholders and the market were not informed about the Officer Defendants' message to 3G Capital that the Company could withstand the increased tariffs and were led to believe the tariffs posed a "***significant risk***" to Skechers' ongoing business operations.

11. The Information Statement also entirely omitted that from the beginning of the negotiations in December 2024, the Greenbergs "decided to engage with 3G on an ***exclusive basis*** with respect to a transaction," thereby effectively foreclosing a genuine bidding process for the Take-Private. By hiding this early exclusive arrangement between Skechers' controlling shareholders and 3G Capital, while describing the Independent Committee's and Greenhill's consideration of potential counterparties and alternatives, the Skechers Defendants misleadingly conveyed that the absence of competing bids reflected market conditions rather than the Greenbergs' commitment to deal only with 3G Capital.

12. In addition, the Information Statement conveyed that the number of potential counterparties for Skechers was likely low and that the Take-Private with 3G Capital was the most attractive available alternative for Skechers. [redacted]

[redacted]. Instead of disclosing this to public shareholders, [redacted] and this potential strategic alternative was not disclosed to unaffiliated shareholders. Nor was the fact that in April 2025, [redacted]

13. Defendants' material misstatements and omissions, together with other aspects of their fraudulent scheme, deprived unaffiliated shareholders of the ability to make an informed decision about the actual value of their Skechers Class A common stock. Defendants' wrongful acts and omissions caused Plaintiff and the Class to suffer damages through the sale of their Skechers' shares at artificially deflated prices during the Class Period. Additionally, had Plaintiff and the Class not been induced to sell at deflated prices, they could have secured the fair value of their shares through an appraisal proceeding.

## II. JURISDICTION AND VENUE

14. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5. This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

15. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). At all relevant times, Skechers was headquartered in this District, and many of the acts and conduct that constitute the violations of law complained of herein occurred in this District, including the dissemination of false and misleading statements in and from this District during the Class Period.

16. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Plaintiff

17. Plaintiff SM Merger/Arbitrage, L.P. ("SM Merger/Arbitrage") is a private investment fund overseen by its general partner and investment advisor, S. Muoio & Co. LLC. SM Merger/Arbitrage's principal place of business is located in New York, NY.

18. As set forth in the certification attached hereto as Exhibit A, Plaintiff beneficially owned and exchanged Skechers Class A common stock in the Take-Private and suffered damages as a result of the Defendants' violations of the federal securities laws alleged herein.

### B. Defendants

#### 1. Skechers

19. Defendant Skechers is a Delaware corporation with its principal executive offices located at 228 Manhattan Beach Boulevard, Manhattan Beach, California. Skechers is a company that designs and markets footwear, apparel, and accessories in regional offices and showrooms globally.

20. At the time of the Take-Private, Skechers was controlled by its CEO, Robert Greenberg, the Company's President, Michael Greenberg, and a series of voting trusts for which the Greenbergs were trustees and who collectively held a majority of the total voting power of the Company. During the Class Period, Skechers' Class A common stock was listed and publicly traded on the New York Stock Exchange ("NYSE") under the ticker symbol "SKX". Skechers continues to exist as a privately held subsidiary of 3G Capital following the Take-Private.

21. Skechers' Class A common stock was entitled to one vote per share on major corporate transactions such as the Take-Private. The Company's Class B

shares were entitled to ten votes per share and were not publicly traded. Skechers' Class B common stock was freely convertible into Class A common stock on a one-to-one basis and held identical economic rights as the Class A shares. This dual-class structure ensured that Skechers' founders, Defendants Robert and Michael Greenberg, maintained voting control over the Company while it operated as a public corporation.

22. Skechers issued the Information Statement and other public statements during the Class Period that contained certain of the materially false and misleading statements and omissions of material fact alleged herein.

**2. The Officer Defendants**

23. Defendants Robert Greenberg, Michael Greenberg, David Weinberg and John Vandemore are the "Officer Defendants" as defined above.

**a. Robert Greenberg**

24. Defendant Robert Greenberg founded Skechers with his son, Michael Greenberg, in 1992. Robert Greenberg has been the CEO and Chairman of Skechers since 1992, and he remains as CEO and director of the now privately held Company.

25. As of the Take-Private announcement, Defendant Robert Greenberg and his Greenberg Family Trust (the "Greenberg Trust") beneficially owned 17,882,868 shares of Skechers Class A common stock (comprised of 17,875,656 shares of Skechers Class B common stock convertible to Class A common stock on a one-to-one basis, and 7,212 of Class A common stock). Through these substantial holdings, Robert Greenberg beneficially owned 12% of Skechers' Class A common stock and 92.6% of Skechers' Class B common stock at the time of the Take-Private announcement.

26. At the time the Take-Private closed, Defendant Robert Greenberg elected to receive the Mixed Merger Consideration for all 17.8 million shares of converted Skechers Class A common stock that he beneficially owned. Under this

election, Robert Greenberg and the family member beneficiaries of the Greenberg Trust received over $1 billion in upfront cash compensation through the Take-Private. He also received 17.8 million private LLC units in the post-Take-Private Skechers entity. Robert Greenberg's election to receive the Mixed Merger Consideration allowed him to convert an enormous portion of his personal Skechers' holdings into cash, while still maintaining a substantial financial stake in the now privately held Skechers.

27. Robert Greenberg also secured his ongoing operational control over Skechers through his post-Take-Private appointment as the private Company's CEO. In addition, he maintained his control over Company governance through his continued role as Board Chairman of the now private Skechers.

**b. Michael Greenberg**

28. Defendant Michael Greenberg has been Skechers' President and a Board member since 1992 and maintains those positions in the post-Take-Private entity.

29. At the time of the Take-Private announcement, Michael Greenberg and the Michael Greenberg Trust beneficially owned 626,425 shares of Skechers Class A common stock (including 400,507 shares of Skechers Class B common stock convertible to Class A common stock on a one-to-one basis). He beneficially owned 2.1% of Skechers' Class B common stock as of May 3, 2025, and together with his father, the Greenbergs beneficially owned 94.7% of the Company's Class B shares at this time. Their collective ownership of Class B common stock allowed the Greenbergs and their family trusts to approve the Take-Private by written consent without a vote by public shareholders who held Class A common stock.

30. Michael Greenberg elected to receive the Mixed Merger Consideration on all of his Skechers' shares, for which he, together with his father and their respective trusts, received over $1 billion in cash payments and more than 18

million private LLC units in the post-Take-Private Skechers entity. This allowed him to maintain an equity stake in the now privately held Skechers.

31. Like his father, Michael Greenberg maintained operational and corporate governance control over the privately held Skechers through his continued employment as President and Executive Director of the post-Take-Private Company.

**c. David Weinberg**

32. Defendant David Weinberg ("Weinberg") is a founding member of Skechers and has been the Company's Chief Operating Officer ("COO") since 2006 and a Skechers director since 1998. Like the Greenbergs, Defendant Weinberg maintains these positions in the post-Take-Private Skechers.

33. At the time of the Take-Private announcement, Defendant Weinberg and The David Weinberg Trust beneficially owned 223,369 shares of Skechers Class A common stock and no Class B common stock. SEC filings indicate Weinberg exchanged 192,961 shares for Mixed Merger Consideration and received more than $17 million in cash in the Take-Private.

**d. John Vandemore**

34. Defendant John Vandemore ("Vandemore") has been Skechers' Chief Financial Officer ("CFO") since 2017 and retains that position in the post-Take-Private Company. At the time of the Take-Private announcement, Vandemore beneficially owned 100,282 shares of Skechers Class A common stock and no Class B common stock. SEC filings indicate Vandemore exchanged 82,672 Skechers shares for the Mixed Merger Consideration and received millions of dollars in total Take-Private-related compensation including accelerated equity.

**3. The Independent Committee Defendants**

35. **Defendant Katherine Blair** ("Blair") was a Skechers Board member since 2019 and was a member of the Independent Committee at the time of the

Take-Private. Blair stepped down from the Skechers Board when the Take-Private closed. SEC filings indicate Blair exchanged 9,400 shares of Skechers Class A Common Stock for Mixed Merger Consideration in the Take-Private.

36. **Defendant Morton Erlich** ("Erlich") was a Skechers Board member since 2006 and was a member of the Independent Committee at the time of the Take-Private. Erlich stepped down from the Skechers Board when the Take-Private closed. SEC filings indicate Erlich and his family trust exchanged a total of 45,500 shares of Skechers Class A Common Stock for Mixed Merger Consideration in the Take-Private.

37. **Defendant Zulema Garcia** ("Garcia") was a Skechers Board member since 2021 and was a member of the Independent Committee at the time of the Take-Private. Garcia stepped down from the Skechers Board when the Take-Private closed. SEC filings indicate Garcia exchanged 6,900 shares of Skechers Class A Common Stock for Mixed Merger Consideration in the Take-Private.

38. **Defendant Yolanda Macias** ("Macias") was a Skechers Board member since 2022 and was a member of the Independent Committee at the time of the Take-Private. Macias stepped down from the Skechers Board when the Take-Private closed. SEC filings indicate Macias exchanged 8,000 shares of Skechers Class A Common Stock for Mixed Merger Consideration in the Take-Private.

39. **Defendant Richard Siskind** was a Skechers Board member since 1999 and was a member of the Independent Committee at the time of the Take-Private. Siskind stepped down from the Skechers Board when the Take-Private closed. SEC filings indicate Siskind exchanged 153,999 shares of Skechers Class A Common Stock for Mixed Merger Consideration in the Take-Private.

40. Collectively, Defendants Blair, Erlich, Garcia, Macias and Siskind are referred to herein as the "Independent Committee Defendants." Skechers, the

Officer Defendants, and the Independent Committee Defendants together constitute the Skechers Defendants, as defined above.

**4. The 3G Capital Defendants**

41. **Defendant 3G Capital Partners L.P.** is an investment firm and private partnership headquartered in New York City. 3G Capital acquired Skechers through its affiliated entities, Beach Acquisition Co Parent, LLC and Beach Acquisition Merger Sub, Inc. In addition to its Take-Private acquisition of Skechers, 3G Capital has been involved in numerous other significant acquisitions, such as the $4 billion purchase of Burger King to form Restaurant Brands International and the $107 billion acquisition of SABMiller by Anheuser-Busch InBev.

42. **Defendant 3G Fund VI, L.P.** is an affiliate of investment funds managed by 3G Capital Partners L.P. Beach Acquisition Co Parent, LLC is a direct, wholly owned subsidiary of 3G Fund VI, L.P. After the Take-Private closed, 3G Fund VI, L.P. controls at least 78.6% of the beneficial ownership and voting power of Beach Acquisition Co Parent, LLC. 3G Capital Partners L.P., 3G Fund VI, L.P., Beach Acquisition Co Parent, LLC and Beach Acquisition Merger Sub, Inc. are defined herein as "3G Capital."

43. **Defendant Alexandre Behring** is a co-founder and co-managing partner of 3G Capital.

44. **Defendant Daniel Schwartz** is a co-managing partner of 3G Capital.

45. Defendants 3G Capital Partners L.P., 3G Fund VI, L.P., Behring and Schwartz are collectively referred to herein as the "3G Capital Defendants."

**5. The Greenhill Defendants**

46. **Defendant Greenhill & Co., LLC** (previously defined as "Greenhill") is a New York Limited Liability Company headquartered in New York City with additional offices throughout the U.S. and overseas. Greenhill is a wholly owned subsidiary of Mizuho Americas LLC. Greenhill served as the financial

advisor to the Skechers Board in connection with the Take-Private and issued the Fairness Opinion on the transaction.

47. **Defendant Zahid Ahmed** is a Managing Director at Greenhill and was the lead relationship banker advising the Officer Defendants and, nominally, Skechers, in negotiations with 3G Capital and in connection with the Take-Private.

48. Greenhill and Ahmed are collectively referred to herein as the "Greenhill Defendants."

## IV. OVERVIEW OF THE FRAUD

### A. Skechers is Formed and Controlled by Robert and Michael Greenberg

49. Defendants Robert and Michael Greenberg co-founded Skechers in 1992. Skechers conducted an IPO in June 1999 and its Class A common stock began trading on the NYSE. After the IPO closed, Skechers continued to be controlled by Robert and Michael Greenberg, with their other family members also holding significant stock in the Company.

50. The IPO created a dual-class stock structure that ensured the Greenbergs would retain control over the Company. Skechers Class A common stock was publicly traded and such stockholders were entitled to one vote per share. The Company's Class B common stock was not listed or traded on any exchange, and its holders were entitled to ten votes per Class B share on any corporate transactions.

51. Through their substantial holdings of Class B common stock, Robert and Michael Greenberg, together with their voting trusts, held over 58% of the total stockholder voting power after the IPO. They retained this majority voting control at the time of the Take-Private, which allowed them to execute the transaction without a vote by unaffiliated shareholders.

**B. 3G Capital Initiates Discussions with the Officer Defendants**

52. Years before the Take-Private was announced, the Officer Defendants and 3G Capital engaged in preliminary discussions about a potential transaction. In 2021, 3G's co-managing partner Daniel Schwartz reached out to the Officer Defendants to learn more about Skechers and its operations. Mr. Schwartz and the Officer Defendants met in November 2021 and discussed an overview of Skechers' business, as well as the overall footwear and apparel industry. At the meeting, Schwartz indicated that Skechers was a desirable investment candidate for 3G Capital.

53. On April 1, 2022, Mr. Schwartz toured Skechers' distribution center in California with Defendants Weinberg (Skechers' COO) and Michael Greenberg (Skechers' President). During this visit, Mr. Schwartz also had dinner with Skechers' CEO, Robert Greenberg, where they discussed Mr. Greenberg's future goals for the Company, as well as 3G Capital's investment business.

54. Over the next several years, Defendants Weinberg and Vandemore had several follow-up meetings with Mr. Schwartz and Mike Spinello of 3G Capital. These meetings occurred from June 2022 through November 2024, during which Skechers' operational and financial performance was discussed. In turn, Messrs. Schwartz and Spinello discussed 3G Capital's overall business and investment strategy.

55. On December 17, 2024, the Officer Defendants met with Mr. Schwartz and other 3G Capital representatives. At the meeting, Mr. Schwartz told the Officer Defendants that 3G Capital wanted to explore an acquisition proposal for the Company. The 3G Capital representatives also discussed at this meeting their desire for the Officer Defendants to remain actively involved in managing the ongoing business operation of the Company following any potential acquisition by 3G Capital. Hence, as early as December 17, 2024, 3G Capital and the Officer

Defendants discussed their post-transaction employment at the privately held Company.

56. Further to this goal, the 3G Capital representatives stated that any transaction with Skechers needed to include an agreement by Skechers management to rollover certain of their Skechers shares into equity in the post-transaction Skechers entity. By insisting that Skechers management, including the Officer Defendants, roll over a significant portion of their equity, 3G Capital ensured that the Officer Defendants would stand on the opposite side of the transaction from the public shareholders, inviting them to depress the share price to maximize their own gain. That is, 3G Capital's rollover demand, which was ultimately memorialized in the Merger Agreement as the Mixed Merger Consideration option, effectively put the Officer Defendants in conflict with the interests of public shareholders to obtain the highest per share price possible under the eventual Take-Private and laid the foundation for the fraudulent scheme that followed.

57. A non-disclosure agreement was then executed between Skechers and 3G Capital on December 19, 2024 to allow for the receipt of confidential Company information in connection with 3G Capital's due diligence review of Skechers.

58. Having discussed their continued post-transaction employment with 3G Capital as early as December 17, 2024, Defendants Robert and Michael Greenberg decided to engage with 3G Capital on "***an exclusive basis***" in connection with a Company transaction, effectively ensuring that another buyer would not offer a higher price for Skechers, including the Class A common stock held by public, unaffiliated shareholders. The Information Statement represented that there was "no agreement or understanding to provide post-closing employment or compensation to members of Skechers management," which was misleading in light of those discussions. [redacted]

[redacted]

59. [redacted]

60. Greenhill reiterated this in a presentation to the Skechers Board on April 30, 2025, where it stated its [redacted] The Greenbergs' decision to exclusively engage with 3G was not disclosed to public shareholders in the Information Statement or otherwise.

**C. The Officer Defendants Provide 3G Capital with Skechers' Ordinary Course Financial Projections**

61. As part of 3G Capital's due diligence process, Skechers provided 3G Capital with Company financial projections. On January 8, 2025, 3G Capital was provided with Skechers' current long range financial plan for fiscal years 2025 through 2028 (referenced in the Information Statement as the "Updated 2024 Long Range Plan" (the "2024 LRP")). The 2024 LRP was originally prepared by the Company in mid-2024, a few months prior to any discussions with 3G Capital on a transaction. The 2024 LRP was an update from earlier projections to account for

Skechers' preliminary actual financial results for 2024, as well as the Company's preliminary 2025 annual operating plan. These pre-Take-Private projections prepared in the ordinary course of Skechers' business contained the following financial metrics for the Company:

**2024 LRP**

| $ in millions | 2025E | 2026E | 2027E | 2028E | 2029E |
|---|---|---|---|---|---|
| Sales | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Operating Income(1) | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Taxes | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Depreciation and Amortization | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

(1) Equal to earnings before interest and taxes or EBIT.

62. Skechers' 2025 Annual Operating Plan (the "2025 AOP") was provided to 3G Capital on January 30, 2025. The 2025 AOP reflected the following figures for the Company's sales and operating income for fiscal year 2025:

**2025 Annual Operating Plan**

| $ in millions | 2025E |
|---|---|
| Sales | $9,792 |
| Operating Income | $928 |

63. On February 6, 2025, in connection with a routine quarterly and year-end earnings release, Skechers publicly announced its financial guidance for 2025, which included sales projections of $9.7 to $9.8 billion for the year. This 2025 financial guidance was in line with the 2025 AOP Skechers had provided to 3G Capital a week prior. As detailed below, at the direction of the Officer Defendants,

Skechers subsequently withdrew its 2025 financial guidance, purportedly in response to the escalating trade tariffs between the U.S. and China in early 2025, but actually as part of a scheme to justify depressing the Merger Consideration.

64. Subsequently, in a further effort to justify the $63 per share Merger Consideration and ensure the enormously lucrative Mixed Merger Consideration for Robert and Michael Greenberg, the Officer Defendants and Greenhill worked to artificially lower the Company's financial projections on several occasions ***after*** 3G Capital made its final offer and before the Board formally acted to recommend the Take-Private. In turn, Greenhill used these manipulated financial projections to calculate per share valuation ranges for Skechers Class A common stock that aligned with the Merger Consideration. *See infra* IV.J.

**D. 3G Capital Makes Initial Offers to Acquire Skechers and the Officer Defendants Make a Counteroffer**

65. On February 19, 2025, Alexandre Behring and Daniel Schwartz of 3G Capital met with Robert Greenberg, David Weinberg and John Vandemore to discuss their initial due diligence analysis. At the meeting, Messrs. Behring and Schwartz proposed a transaction structure in which all Skechers shareholders would receive cash and an option to rollover part of their Skechers shares into equity in the post-closing Company (the "February 19 Offer").

66. Under the February 19 Offer, Skechers shareholders would receive ***$68 per share*** in cash and one equity unit in the post-transaction entity, with an illustrative per unit capital contribution amount of ***$12 per unit***. The capital contribution amount represented the dollar value of the existing Skechers equity that a shareholder chose to reinvest or rollover into the newly formed private Company, implying a nominal total value under the February 19 Offer of ***$80 per share***. 3G Capital also proposed an all-cash offer of ***$80 per share*** of Class A

common stock—a full ***$17 more*** than the Merger Consideration Defendants ultimately agreed to under the Take-Private.

67. On March 3, 2025, the U.S. raised tariffs on all Chinese imports to 20%. The Chinese government responded on March 4 by imposing additional tariffs of up to 15% on certain U.S. imports. 3G Capital immediately leveraged the announcement of these tariffs to try to acquire Skechers at a discount.

68. At a meeting on March 12, 2025 with the Greenbergs and David Weinberg, Messrs. Behring and Schwartz expressed concern about the potential impact the increasing U.S.-Chinese tariffs would have on Skechers' business operations going forward. Despite this, Messrs. Behring and Schwartz made 3G Capital's preliminary and non-binding offer to acquire Skechers at the March 12 meeting (the "March 12 Offer").

69. Under the March 12 Offer, Skechers shareholders could choose to receive the following for each share of Skechers Class A common stock: (i) ***$73 in cash***, or (ii) ***$66 in cash*** and one equity unit in the post-transaction entity. The number of Skechers shares entitled to the cash plus equity option would be limited to an amount of outstanding Skechers shares to be negotiated by the parties. The cash plus equity option would also be subject to proration if the Skechers shares electing this option exceeded the cap. Under the March 12 Offer, 3G expected the per unit capital contribution amount to be ***$22***, making the total consideration value under the cash plus equity option ***$88*** per Skechers share of Class A common stock.

70. The equity units issued under the second option would be subject to certain restrictions and limitations. The units would not be listed on a stock exchange and would not be transferrable. As such, the post-closing private company would terminate its reporting requirements under the Exchange Act, giving the unitholders who would not be officers in the post-transaction company dramatically reduced transparency into the private company's business operations. The equity

units would also be represented by a board seat held by a "Legacy Member Representative." At any time after the fifth anniversary of the closing, the Legacy Member Representative would have the ability to request that the post-closing company pursue a liquidity event (*i.e.*, an IPO or sale/merger).

71. On March 19, 2025, David Weinberg of Skechers and Daniel Schwartz of 3G Capital had a meeting to discuss the Officer Defendants' reaction to the March 12 Offer. At the meeting, Weinberg made a counterproposal for each Skechers Class A shareholder to receive either (i) ***$75 per share in cash***, or (ii) ***$72 per share*** in cash plus one equity unit in the post-closing private Company. Weinberg proposed that the per unit capital contribution amount would be $18, making the total consideration value for this option equal to ***$90 per share***. This was the Officer Defendants' only counterproposal to 3G Capital during the course of their negotiations. In making this proposal, Weinberg anticipated that the Officer Defendants would be able to take advantage of the cash and equity unit alternative.

72. On March 24, 2025, Daniel Schwartz rejected Defendant Weinberg's counterproposal but reiterated that 3G Capital was still willing to move forward with its March 12 Offer.

73. As negotiations regarding the Take-Private continued, Skechers entered into a non-disclosure agreement with Greenhill on March 31, 2025. The agreement was the first step towards engaging Greenhill as the financial advisor to the Board on a Take-Private transaction with 3G Capital. Although the Greenhill non-disclosure agreement gave it access to material financial information about Skechers, Greenhill was not formally retained as the Board's financial advisor until late April.

**E. Greenhill is Instructed to Disregard Other Strategic Transaction Alternatives That Were Not Disclosed**

74. Zahid Ahmed was Greenhill's lead banker on the 3G Capital-Skechers Take-Private transaction. Undisclosed to public shareholders was the fact that while Ahmed and Greenhill were serving as the Board's financial advisor on the Take-Private, they were also evaluating other strategic alternatives for Skechers.

75. One such alternative transaction [redacted] In 2021, [redacted] This potential buyout was also considered by Greenhill at the same time it was assessing the Take-Private with 3G Capital.

76. [redacted] Skechers common stock closed at $57.80 per share on March 27, [redacted]

77. Despite this, Vandemore contacted Mr. Ahmed later on March 27 [redacted] and focus on the 3G Capital Take-Private instead. In response, on March 29, [redacted] Greenhill complied with this instruction in furtherance of Defendants' scheme to conceal the true value of Skechers and enable the Merger to be effectuated at a

deflated price to be paid to Skechers' public stockholders. [redacted]

78. Also undisclosed was the fact that [redacted] In presentation slides prepared in April 2025, Greenhill stated that [redacted]

79. Greenhill also analyzed [redacted] that was not disclosed to Skechers' public shareholders. Greenhill stated in April 2025 presentation slides that [redacted]

80. As with [redacted], Greenhill's analysis of [redacted], or even the existence of these potential alternative transactions, was not disclosed to Skechers' public shareholders.

**F. The Skechers Board is Finally Notified About Negotiations With 3G Capital**

81. On April 1, 2025, Skechers' full Board met with Defendants Michael Greenberg, John Vandemore and David Weinberg in attendance, as well as in-house Skechers counsel and lawyers from Skechers' outside legal counsel at Latham & Watkins LLP ("Latham"). At the meeting, management discussed with the Board the background of 3G Capital's due diligence review and the negotiations over a going-private transaction between the Officer Defendants and 3G Capital, which by then had been ongoing for several months. Upon information and belief, this was the first time the full Board was briefed on those negotiations.

### G. The Officer Defendants Assure 3G Capital that the Escalating U.S.-China Tariffs Would Have Minimal Impact on Skechers' Business

82. In April 2025, the trade war between the U.S. and China intensified through a series of escalating import tariffs between the countries. A day after the Board's April 1 meeting, the U.S. announced that it was raising tariffs on Chinese and Vietnamese imports to 54% and 46%, respectively. These increased tariffs were placed on virtually all goods imported into the U.S from these countries, including apparel and footwear.

83. On April 4, 2025, China responded with reciprocal tariffs of 34% on certain U.S. imports. On April 8, the U.S. announced a 90-day pause in country-specific tariffs, except for Chinese imports. Instead of a pause for China, the U.S. increased its tariffs on Chinese goods to 84%. The Chinese government responded on April 9 with a reciprocal tariff of 84% on U.S. goods imported into China.

84. On April 9, 2025, the U.S. government announced it was increasing its tariffs on Chinese imports from 84% to 145%, which would become effective April 10, 2025. In turn, the Chinese government announced on April 11, 2025 that it was responding to the increased U.S. tariffs by raising its tariffs on certain U.S. imports from 84% to 125%.

85. During meetings between 3G Capital representatives and certain of the Officer Defendants throughout April 2025, 3G Capital expressed concerns about the U.S.-China tariffs and their impact on Skechers' business and the potential transaction between the companies. 3G Capital's purported tariff-related concerns were described in the Information Statement. Yet, these descriptions wholly omitted that the Officer Defendants informed 3G Capital that the Chinese tariffs would have a minimal negative impact on Skechers' business. 3G Capital's own due diligence of the Company confirmed this.

86. This information was shared with the 3G IC. Specifically, the 3G IC was informed by 3G Capital personnel of the Officer Defendants' assurances that the Company was well-positioned to withstand any truly negative impact of the U.S.-China trade war.

87. In an April 25, 2025 [redacted]

88. [redacted]

89. [redacted]

[redacted]

90. The Officer Defendants and 3G Capital also understood that Skechers was better positioned than its peer companies to quickly adjust to tariff impacts, given the Company's lower price points that would attract consumers seeking lower cost footwear in response to the tariffs. [redacted] In other words, [redacted]

91. 3G Capital was accordingly informed by the Officer Defendants that Skechers would be able to readily withstand any negative impact of the increased tariffs imposed on the U.S. and China. These facts were not disclosed to public shareholders in the Information Statement or elsewhere. Despite 3G Capital's access to internal Company information showing that Skechers' business and stock price could effectively manage any market disruptions caused by the U.S.-China tariffs, it still used the tariffs as a basis to propose a lower Merger Consideration. Skechers and the Officer Defendants in turn publicly represented that the tariffs posed a significant risk to Skechers' ongoing business operations and profit margins.

### H. 3G Capital Makes its Final Offer

92. On April 13, 2025, Daniel Schwartz of 3G Capital met with Defendant Vandemore. At the meeting, Schwartz conveyed 3G Capital's best and final offer to Vandemore and used the U.S.-China tariffs as a basis to lower the proposed Take-Private transaction price (the "April 13 Offer").

93. The April 13 Offer maintained the dual-consideration structure used in the March 12 Offer but lowered the per share consideration. Specifically, the April 13 Offer proposed that Skechers shareholders could elect to receive either (i) ***$63 per share*** in cash (the "Merger Consideration"), or (ii) ***$57 per share*** in cash plus one equity unit in the post-closing private entity (the "Mixed Merger Consideration"). Under the April 13 Offer, 3G Capital expected the per unit capital contribution amount to be ***$29***, implying a nominal total value of ***$86 per Skechers share*** under the Mixed Merger Consideration option.

94. The April 13 Offer lowered the cash Merger Consideration option by $10 per share from the March 12 Offer (*i.e.*, $73 per share to $63 per share). But the increased capital contribution amount of $29 for the post-closing equity units was $7 higher than the $22 per share capital contribution amount in the March 12 Offer (*i.e.*, $22 v. $29 per unit). While the Mixed Merger Consideration was nominally greater than the cash Merger Consideration (*i.e.*, $86 per share v. $63 per share), it was subject to similar limitations and restrictions as in the March 12 Offer. These restrictions were designed to favor the Officer Defendants and limit the eligibility of public shareholders, thereby disincentivizing public shareholders from electing the Mixed Merger Consideration.

95. Specifically, the Mixed Merger Consideration was capped at 20% of Skechers' outstanding common stock. The Mixed Merger Consideration option was further limited to Skechers shareholders who held their shares continuously from the close of business on May 2, 2025 through the Merger close (*i.e.*, "Legacy

Shares”). The Mixed Merger Consideration option would also be subject to proration if the Skechers shares electing this option exceeded the 20% cap. If the cap was exceeded, shareholders would only receive a pro-rated portion of the Mixed Merger Consideration.

96. As in the March 12 Offer, the private equity units issued as part of the Mixed Merger Consideration would not be listed or transferrable on a public stock exchange. Unitholders would also have drastically limited rights to information regarding the newly formed private entity since it would not be subject to Exchange Act reporting requirements. The equity unitholders would also be represented by a “Legacy Member Representative” who had the authority to request a sale or IPO of the private Company five years after the Take-Private closed.

97. At a subsequent meeting on April 21, 2025, Daniel Schwartz informed Vandemore that 3G Capital’s April 13 Offer was the maximum consideration it was willing to offer, effectively making it 3G Capital’s “best-and-final” offer for Skechers.

98. On April 22, 2025, outside counsel for 3G Capital at Paul, Weiss, Rifkind, Wharton & Garrison LLP (“Paul Weiss”) sent a term sheet memorializing the April 13 Offer to Skechers’ outside counsel at Latham. These concrete steps towards finalizing the Take-Private were taken despite the fact that no Independent Committee of directors had been formed, and Greenhill had not yet been formally retained as financial advisor to the Board.

## I. Greenhill is Formally Retained After Already Working on the Take-Private for a Month

99. Defendants Weinberg and Vandemore met with outside directors Katherine Blair, Morton Erlich, Zulema Garcia, Yolanda Macias and Richard Siskind on April 22, 2025 to discuss 3G Capital’s April 13 Offer. These directors would ultimately comprise the yet-to-be-formed Independent Committee.

100. At the meeting, Defendants Weinberg and Vandemore also discussed the impact of the U.S.-China tariffs on Skechers' business and how the tariffs purportedly resulted in 3G Capital's lower April 13 Offer. In this regard, Weinberg and Vandemore characterized 3G Capital's April 13 Offer as "g[iving] effect to the tariffs."

101. On April 23, 2025, Greenhill was formally retained as the Board's financial advisor on the Take-Private. This retention occurred almost a month ***after*** Greenhill was given access to Skechers' internal financial information that it used to evaluate the fairness of Take-Private transaction and the Merger Consideration.

### J. Skechers Withdraws its 2025 Guidance and its Financial Projections Are Artificially Lowered to Support 3G Capital's Final Offer

102. Skechers reported its First Quarter 2025 financial results on April 24, 2025. The financial results reflected "record quarterly sales of $2.41 billion," which represented a 7.1% increase from the first quarter of 2024. The Company also reported gross profits of $1.25 billion, representing a 6.2% increase from the first quarter of 2024. Despite this positive financial news, the Company stated that "***[d]ue to macroeconomic uncertainty stemming from global trade policies***" such as the escalation of tariffs between the U.S. and China in the first four months of 2025, Skechers was not providing financial guidance and was instead "***withdrawing the annual 2025 guidance***" it provided to shareholders at the beginning of the year.

103. The Company sales figures in the withdrawn 2025 financial guidance were nonetheless consistent with the 2025 AOP Skechers had provided to 3G Capital on January 30, 2025. Both had estimated sales of $9.7-$9.8 billion for 2025.

104. Contrary to the stated reason for the withdrawal of its 2025 financial guidance, the guidance was actually withdrawn to mislead Skechers' public stockholders and the market into believing that Skechers stock was less valuable

than it actually was, thereby facilitating acceptance of 3G Capital's offer. Indeed, the announced withdrawal of its 2025 financial guidance gave the misleading impression that the Skechers Defendants viewed the escalating tariffs between the U.S. and China as posing a substantial risk to Skechers' future financial growth and profitability. They omitted the fact that the Officer Defendants had assured 3G Capital that any tariff-related risks to the Company's business operations and financials would be minimal. [redacted] *See supra* IV.G. Defendants further omitted that they sought to back into the Merger Consideration in 3G Capital's final April 13 Offer by lowering the Company's financial projections several times between April 23 and April 27, 2025 to make the $63-per-share cash Merger Consideration appear fair to Skechers' unaffiliated shareholders.

105. The market price of Skechers' stock fell after Skechers withdrew its 2025 guidance, citing uncertainty about tariffs, from a closing price of $50.49 per share on April 24 to a closing price of $47.79 the next day, following the press release and earnings call, a decrease of 5.35%.

106. Between April 23 and April 27, 2025, the Officer Defendants schemed with Greenhill to manipulate Skechers' financial projections downward in an effort to justify the lower Merger Consideration offered to shareholders in 3G Capital's final April 13 Offer. These revised projections significantly lowered the Company's expected revenue growth and contradicted the ordinary course projections in the 2024 LRP and 2025 AOP that Skechers prepared before 3G Capital's April 13 Offer. *See supra* IV.C.

107. Defendant Vandemore [redacted]

[redacted]

108. [redacted]

109. The subject of their conversation presumably involved [redacted]

110. On April 26, 2025, [redacted]

[redacted]

111. [redacted]

112. [redacted]

[redacted]

[redacted]

113. On April 27, 2025, yet another reduced set of projections was crafted by the Officer Defendants (the "April 27 LRP2 Projections"). [redacted]

114. Greenhill also calculated a still lower DCF price range based on the April 27 LRP2 Projections. Greenhill's DCF based on the April 27 LRP2 Projections calculated a price range of $51.61 to $68.21 per share, with a midpoint of ***$59.91 per share***. Upon information and belief, the April 27 LRP2 Projections are the "Skechers Management Projections" referenced in the Information Statement. The Skechers Defendants stated in the Information Statement that Greenhill's DCF "implied a value per share range of Skechers Common Stock of $51.60 to $68.20," with no disclosure whatsoever of the higher DCFs Greenhill had calculated based on the earlier projections. Defendants had now manipulated the very recent Company projections enough to make 3G Capital's April 13 Offer appear to be fair to unaffiliated Company shareholders.

115. [redacted]

116. None of Greenhill's higher DCF price ranges, or the fact that the Officer Defendants manipulated Skechers' financial projections downward three times over the course of four days in an effort to justify 3G Capital's April 13 Offer was disclosed to Skechers' public shareholders.

**K. The Independent Committee is Formed Only Four Days Before the Take-Private is Approved and Greenhill Presents the Lowered Skechers' Valuation to the Board**

117. The Independent Committee was finally formed at a meeting of the Company's outside directors on April 30, 2025. The Independent Committee was comprised of outside directors Blair, Erlich, Garcia, Macias and Siskind. The Independent Committee was only formed *after* the Officer Defendants had been negotiating a transaction for months, and *after* 3G Capital's final April 13 Offer had been presented to the Officer Defendants. By the time the Independent Committee was formed, 3G Capital and the Officer Defendants had negotiated all essential terms of the Take-Private, including price, the Greenbergs' significant planned equity rollovers into the new private Company and the Officer Defendants' post-closing executive positions at the new Company.

118. On April 30, 2025, the Independent Committee held a meeting with Defendant Vandemore, other Company officers, Greenhill representatives and attorneys from Latham. Greenhill presented details of the Mixed Merger Consideration component of 3G Capital's April 13 Offer at the meeting. This included a discussion of the "Legacy Member Representative" who held the information rights for the post-closing private Company and would have the authority to request a sale or IPO of the private Company five years after the Take-Private closed. Greenhill informed the Independent Committee that under 3G Capital's proposal, the Legacy Member Representative "will have a seat on the [post-Take-Private] company's board of directors" and that the "initial [Legacy

Member Representative] will be RG [Robert Greenberg]," consistent with 3G Capital's April 27, 2025 illustrative draft LLC agreement. Although a later draft provided that the Legacy Members would elect the Legacy Member Representative by majority-in-interest, the Greenbergs held the substantial majority of the units to be issued to Legacy Members, which positioned Robert Greenberg to continue exerting control over the post-Take-Private Skechers.

119. The belatedly formed Independent Committee also had limited authority to consider alternative bids for Skechers. The April 30 Board minutes indicate that the Independent Committee was empowered to consider "a possible transaction with 3G (or any strategic alternative arising from the proposal from 3G . . . " and the Information Statement describes that mandate as extending to strategic alternatives "that the Independent Committee determines, in its sole discretion, to consider." In practice, the Independent Committee did not conduct or explore other potential alternative bids for the Company.

120. At the April 30 Board meeting, Skechers management members also presented Skechers' April 27 LRP2 Projections to the Independent Committee. In addition, Greenhill made a presentation to the Board on its valuation analysis of the Company.

121. On April 28, the Greenhill deal team presented to the Greenhill fairness opinion committee its per share valuation of Skechers based on the higher LRP1 Projections. [redacted]

122. Instead, at the April 30 Board meeting, Greenhill only presented to the Independent Committee a DCF range based on the lowest set of Company projections—the April 27 LRP2 Projections. Greenhill's DCF range based on these lower projections was $51.61 to $68.21 per Skechers share, with a midpoint of

$59.91 per share. These per share valuations were designed to be more closely aligned with the Merger Consideration in 3G Capital's "best-and-final" April 13 Offer. [redacted]. None of this was disclosed to Skechers' public shareholders or the market in the Information Statement or in any other Skechers SEC filings.

### L. The Board and Independent Committee Recommend Approval of the Take-Private and the Skechers Defendants File the Information Statement

123. The Board and Independent Committee met on May 4, 2025 to conduct a final review of 3G Capital's April 13 Offer and decide whether to approve the transaction. Greenhill presented its oral fairness opinion at the meeting, which was later reiterated in its written Fairness Opinion dated May 4, 2025. Greenhill's Fairness Opinion stated that the cash election consideration offered in 3G Capital's April 13 Offer (*i.e.*, $63 per share) was "fair, from a financial point of view" to the holders of Skechers common stock other than the "Excluded Holders," a group that included the Greenbergs. Greenhill notably did not opine on the fairness of the Mixed Merger Consideration, or the way the Take-Private transaction was structured to favor the Greenbergs. Nor did the Board attempt to value the Parent Units. Although all holders of Legacy Shares could elect the Mixed Merger Consideration, as a practical matter the option principally benefited insiders given the Legacy Share requirement, the 20% cap and proration, and the severe informational and transfer restrictions placed on the equity units.

124. At the May 4 meeting, the Independent Committee recommended approval of 3G Capital's April 13 Offer. This recommendation was made only ***four days*** after the Independent Committee was first formed and presented with

Greenhill's reduced DCF price range based on the artificially lowered projections created by the Officer Defendants.

125. Following the Independent Committee meeting, the full Skechers Board, including Defendants Robert and Michael Greenberg and Defendant David Weinberg, met and also voted to approve the Take-Private and Take-Private Agreement. The Board further recommended that Skechers shareholders entitled to vote adopt the Take-Private Agreement. This shareholder recommendation was superfluous because Robert and Michael Greenberg, and their respective trusts, held approxiately 58.3% of the total stockholder voting power through their substantial holdings of the super-voting Class B common stock.

126. The parties executed the Take-Private Agreement on May 4. The Greenberg Stockholders, including Robert Greenberg, then delivered a written consent approving the Take-Private and Take-Private Agreement without a vote by unaffiliated Skechers shareholders. The Merger was announced by the parties in a joint press release on May 5, 2025.

127. After execution of the Take-Private Agreement, the transaction faced clearances from regulatory agencies in the various countries in which Skechers conducts business. This included antitrust clearance from the U.S. Federal Trade Commission which was obtained on June 24, 2025. After these regulatory clearances were obtained, the Skechers Defendants issued the Information Statement on August 5, 2025, containing the materially false and misleading statements about the Take-Private set forth below.

### M. The Take-Private Closes, and the Greenbergs Receive Enormous Personal Compensation Under the Transaction

128. The Information Statement required Skechers shareholders to elect either the Merger Consideration ($63 per share in cash), or the Mixed Merger Consideration ($57 per share in cash plus one equity unit in the now private

Skechers entity) by September 5, 2025. Shortly after this election deadline, the Take-Private closed on September 12, 2025 and Skechers common stock was delisted from the NYSE.

129. Pursuant to the agreement executed by them on May 4, 2025, Robert and Michael Greenberg and their respective trusts committed all of their Skechers stock holdings to the Mixed Merger Consideration option. Under this election, Robert and Michael Greenberg and the family member beneficiaries of their trusts received over $1 billion in upfront cash compensation through the Take-Private. Robert and Michael Greenberg also received more than 18 million private LLC units in the post-Take-Private Skechers entity when the Take-Private closed.

130. Given their equity rollovers and understanding with 3G Capital, Robert and Michael Greenberg maintained operational control over the privately held Skechers through their continued employment as CEO and President/Executive Director of the post-Take-Private Company, respectively.

## V. THE SKECHERS DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

131. Throughout the Class Period, Defendants issued or caused to be issued public statements that were materially false or misleading and omitted material facts as detailed below in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

### A. The Skechers Defendants Misstated the Reason for the Withdrawal of the Company's 2025 Financial Guidance

132. In an SEC Form 8-K filed on April 24, 2025, the Skechers Defendants announced Skechers' first quarter 2025 financial results. The results reflected "record quarterly sales of $2.41 billion," and gross profits of $1.25 billion, representing a 7.1% and 6.2% increase from the first quarter of 2024, respectively.

Despite this positive financial news, the Company stated that "***[d]ue to macroeconomic uncertainty stemming from global trade policies***, the Company is not providing financial guidance at this time and is ***withdrawing the annual 2025 guidance*** provided in our earnings release of February 6, 2025."

133. The withdrawn guidance had been set forth in the Company's 2024 fourth quarter and full year earnings release filed in an SEC Form 8-K on February 6, 2025. The 2025 guidance in the Form 8-K stated that "[f]or the fiscal year 2025, the Company believes it will achieve sales between $9.70 and $9.80 billion and diluted earnings per share between $4.30 and $4.50."

134. The Skechers Defendants' stated reason for the withdrawal of its 2025 financial guidance was materially false and misleading. The guidance withdrawal indicated that the U.S.-China trade tariffs significantly threatened Skechers' expected sales growth and earnings per share for 2025. They omitted that the Officer Defendants had assured 3G Capital that any tariff-related risks could be easily mitigated through minimal sales price increases, and that the Company had already begun shifting its U.S. sourcing to Vietnam and away from China. *See supra* IV.G.

135. In pointing to "global trade policies" as a basis for the withdrawal of Skechers' 2025 financial guidance, the Skechers Defendants further concealed that the Officer Defendants actually sought to lower the Company's financial projections to align them with the final Merger Consideration in 3G Capital's April 13 Offer. This in fact occurred after the guidance withdrawal, when the Company's internal projections were lowered on three separate occasions between April 23 and 27, 2025 to reach a per share valuation range in line with the April 13 Offer, and a midpoint price that was below the $63 per share offered to Skechers' unaffiliated public shareholders. *See supra* IV.J.

### B. The Skechers Defendants Falsely Asserted the Take-Private Was Fair

136. In a section of the Information Statement titled "**Recommendations of the Independent Committee and the Skechers Board; Skechers' Reasons for the Transaction**" (emphasis in original), Defendants represented to unaffiliated shareholders that:

> At a meeting of the Skechers Board held on May 4, 2025, following the meeting of the Independent Committee, the Skechers Board unanimously adopted resolutions (i) determining that the Merger Agreement, the Transaction and all other transactions contemplated by the Merger Agreement ***are fair to and in the best interests of Skechers and its stockholders***, (ii) approving and declaring advisable the Merger Agreement, the Transaction and all other transactions contemplated by the Merger Agreement . . .

137. The same section of the Information Statement further represented that the Board's fairness determination was based on the Greenhill Fairness Opinion, as follows:

> [A] significant factor[] that supported the Skechers Board's determination and recommendation [included] . . . the opinion of Greenhill rendered to the Skechers Board on May 4, 2025, . . . to the effect that . . . the [Merger Consideration] to be received by the holders of Skechers Common Stock . . . pursuant to the Merger Agreement was ***fair, from a financial point of view, to such holders***. . .

138. The Officer Defendants knew that the opinions about the claimed fairness of the transaction and Merger Consideration were false and misleading because the inputs used to generate it had been affirmatively manipulated. The Officer Defendants caused Skechers' financial projections to be lowered after 3G Capital's April 13, 2025 offer so that Greenhill's DCF would support the predetermined $63 price.

139. The Skechers Defendants also made false and misleading statements about the purported assumptions used in calculating the "Skechers Management

Projections" set forth in the Information Statement. For example, they stated that the "Skechers Management Projections reflect updated assumptions and more recent financial performance relative to those used in the Updated 2024 Long Range Plan" (*i.e.*, the 2024 LRP). With respect to the difference between the "Skechers Management Projections" and the 2025 AOP, the Skechers Defendants similarly stated that the "Skechers Management Projections utilize more recent financial insights and management perspectives on business outlook than were used to construct the [2025] Annual Operating Plan." These statements contained embedded factual representations that the projections reflected bona fide, updated business assumptions. In fact, the projections were manufactured after 3G Capital's final offer and successively lowered to justify a predetermined price, while the LRP1 Projections and the higher DCF analyses were withheld.

140. Skechers and the Officer Defendants knew these statements were materially false and misleading, and knew Greenhill's Fairness Opinion was false because Robert Greenberg, Michael Greenberg and David Weinberg—each a Board member, with Robert Greenberg also serving as CEO and Chairman and Michael Greenberg as president, were aware that between April 23 and April 27, 2025 Skechers' financial projections were manipulated downward in order to justify the Merger Consideration offered to shareholders and to secure the insiders' economic benefits and continued control. Vandemore, Skechers' CFO, supplied the successive projections to Greenhill and participated in the process that produced them.

141. The Independent Committee Defendants, in turn, acted with deliberate recklessness in making these statements of fairness. Given their tenures as long-serving Skechers directors, their direct participation in the April 22 and April 30, 2025 meetings at which the Officer Defendants and Greenhill discussed the Take-Private, tariffs and the Company's financial projections, and the presence of Latham

counsel at the April 30 meeting, the Independent Committee Defendants were aware that they had been formed to approve, rather than meaningfully review and evaluate, the Take-Private, and that they had not made the reasonable inquiries into the fairness of the Take-Private and the Merger Consideration that their public statements represented they had made.

142. The Skechers Defendants did not believe in the accuracy of their statements about the fairness of the Take-Private and Merger Consideration. They knew, or were reckless in not knowing, the material fact that Defendant Vandemore worked with Greenhill representatives to manipulate Skechers' financial projections downward three separate times over four days in an effort to conform the Company's valuation to 3G Capital's "best-and-final" April 13 Offer. The resulting Fairness Opinion was then used to support a current recommendation to shareholders even though it rested on projections that had been deliberately engineered to reach the price already negotiated with 3G Capital.

143. In this regard, the Information Statement failed to disclose that Defendants crafted three separate sets of financial projections after 3G Capital's April 13 Offer (*i.e.*, the LRP1 Projections, the April 26 LRP2 Projections and the April 27 LRP2 Projections), each of which was successively lowered to arrive at a per share price range for Skechers Class A common stock that aligned with the $63 per share in Merger Consideration offered to unaffiliated shareholders. These omissions rendered misleading the affirmative statements described in ¶¶ 139 and 144.

144. The Skechers Defendants further misrepresented Greenhill's DCF analysis in the Information Statement. In a section of the Information Statement titled "***Discounted Cash Flow Analysis***," Defendants stated that "[u]sing the Skechers Management Projections, Greenhill conducted a discounted cash flow analysis for the purpose of determining the fully diluted equity value per share for

the Skechers Common Stock." Defendants further stated that "the results of this analysis implied a value per share range of Skechers Common Stock of ***$51.60 to $68.20***."

145. These statements omitted the material fact that on April 25 and April 27, 2025—mere days before the DCF based on the manipulated Skechers Management Projections, Greenhill calculated higher DCF price ranges based on the LRP1 Projections, as follows:

| **First LRP1 DCF** | **Second LRP1 DCF** |
|---|---|
| [redacted] | [redacted] |

146. The Board's purported reliance on Greenhill's Fairness Opinion to support their statement that the Take-Private was fair was also materially false and misleading. The Skechers Defendants filed the Information Statement knowing that the assumptions underlying Greenhill's Fairness Opinion were inaccurate. In fact, the Officer Defendants, acting through Vandemore, knowingly provided Greenhill with the artificially manipulated April 27 LRP2 financial projections (*i.e.*, the "Skechers Management Projections") that resulted in a lower DCF per share price range presented to the Board and Independent Committee at their April 30 meeting, while withholding the materially higher LRP1-based valuations that Greenhill had calculated only days earlier.

147. With the Officer Defendants' knowledge, Greenhill only presented a DCF price range based on the lower April 27 LRP2 Projections to the Independent Committee. Greenhill's DCF range based on these lower projections was $51.61 to $68.21 per Skechers share, with a midpoint of ***$59.91 per share***. This midpoint figure was lower than the Merger Consideration of $63 per share offered to

Skechers' unaffiliated public shareholders, giving the false impression that the Merger Consideration was fair and that they believed it to be so. Yet as the Officer Defendants knew—and the Independent Committee Defendants were reckless in not knowing—[redacted] Neither the higher DCF midpoint nor the higher LRP1 projections were disclosed to unaffiliated shareholders.

148. The Skechers Defendants did not, and could not, believe the Take-Private was "fair, from a financial point of view" to unaffiliated shareholders as stated in Greenhill's Fairness Opinion given the material omission of these facts concerning the manipulated Skechers financial projections and the Greenhill DCFs reflecting higher per share values for Skechers common stock than the Merger Consideration offered to public shareholders. Defendants' fairness statements are actionable under *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015), because: (i) Defendants did not actually hold the opinion that the Take-Private was fair, given their knowing manipulation and use of projections designed to justify a predetermined price; (ii) the statements contained embedded false facts, including that the Fairness Opinion was based on "Skechers Management Projections" reflecting "updated assumptions" and recent financial performance, when those projections were based on, and manufactured to support, the negotiated price; and (iii) Defendants omitted information that contradicted the basis for their opinion—including the existence of the LRP1 Projections and two prior DCF analyses showing higher values—that would have made the statements misleading to a reasonable investor.

149. The Information Statement, under the circumstances in which it was issued, was reasonably understood by investors to convey facts about how the

Independent Committee Defendants formed their opinion that the Merger was "fair to and in the best interests" of unaffiliated shareholders. It further conveyed that the Independent Committee had made a reasonable inquiry into the basis for Greenhill's analysis and Fairness Opinion, the basis of the financial projections and the true reasons for the changes thereto, and Skechers' business prospects. A reasonable inquiry would have revealed [redacted] the effect of tariffs on Skechers' business, the long-term exclusive relationship between 3G Capital and the Officer Defendants, and the fact that the more valuable Mixed Merger Consideration being offered as a practical matter to insiders was unfairly diverting value from unaffiliated shareholders. The reality was, however, that the Independent Committee Defendants had not made these inquiries. Thus, the representation that they believed the Merger Consideration was fair to the unaffiliated shareholders—even if the Independent Committee genuinely held such a belief—was misleadingly incomplete.

150. Although the Information Statement stated that Greenhill's opinion was rendered as of May 4, 2025 and would not be updated, the Board's own fairness determination was stated in the present tense – that the Merger Agreement and the Transaction "are fair to and in the best interests of Skechers and its stockholders" in the document disseminated to shareholders in August 2025. The as-of-date caveats addressed only the passage of time; they did not disclose, and could not cure, that the opinion and the Board's determination rested on projections manufactured to achieve the $63 price and omitted the higher LRP1-based valuations that existed when the opinion was rendered.

### C. The Skechers Defendants' Statements Concerning the Mixed Merger Consideration Were Misleading Half-Truths

151. The Skechers Defendants made materially misleading statements about the value, economics, and attractiveness of the Parent Units available through the Mixed Merger Consideration. The misleading statements include the following:

(a) The Information Statement represented that 3G Capital increased the expected per-unit capital contribution amount to $29 "to further align Skechers stockholders who elect to receive the Revised Mixed Election Consideration with the economics of the post-closing company given the greater risk and uncertainty facing the Skechers business in particular and the economy generally," and that the Parent Units would be pari passu with the equity issued to 3G Capital. This statement conveyed that the Skechers business faced heightened risk that justified a higher per-unit price (and thus fewer units per share). It omitted that management had assured that tariff impacts could be offset, that the LRP1 Projections and Greenhill's earlier DCF analyses showed higher value, and that the projections were revised downward three times between April 23 and April 27, 2025 to support the negotiated price.

(b) Among the reasons the Independent Committee and the Board gave for approving the Transaction was "the fact that Skechers stockholders who elect the Mixed Election Consideration retain an ongoing economic interest in the business through ownership of Parent Units, thereby allowing such Skechers stockholders to participate in any future growth, profitability, or strategic upside of the Skechers business following the Closing . . ." Having presented the Mixed Election's upside as a reason the Transaction was fair, the Skechers Defendants had to disclose facts bearing on the size of that upside: the LRP1 Projections, the higher DCF values, and the reasons for the late downward revisions. Without those facts, unaffiliated shareholders could not evaluate the upside that the Board itself relied on.

(c) The Information Statement stated that, "because of the uncertainty related to the value of the Parent Units," the Board and the Independent Committee "determined that they were not able to, and decided not to, obtain a fairness opinion for the Mixed Election Consideration," and "considered this decision when determining that the Merger Agreement, the Transaction and all other transactions contemplated by the Merger Agreement are fair." This statement attributed the absence of any valuation to inherent uncertainty. It omitted that the Board and Greenhill had in hand the LRP1 Projections and DCF analyses capable of informing that value, which pointed to a value above the depressed valuation underlying the cash consideration.

(d) The disclaimers do not cure the half-truths. The Information Statement's statements that the per-unit capital contribution amount was not indicative of fair market value, that the value of the Parent Units could be significantly lower, and that the Board did not value the Parent Units warned only of downside. They did not disclose, and could not neutralize, the known facts pointing to higher value. One-sided cautionary language does not protect a statement that omits known contrary facts. Unaffiliated shareholders were thereby misled in deciding between the Cash Election, the Mixed Election, and appraisal, which furthered the diversion of value to insiders.

**D. The Skechers Defendants Misrepresented the Impact of Trade Tariffs on the Company's Business and Take-Private Negotiations**

152. The Skechers Defendants falsely represented that the reciprocal tariffs between the U.S. and China in early 2025 threatened Skechers' overall business operations and stock price. The Information Statement also falsely represented that the trade tariffs impacted the Take-Private negotiations and the resulting Merger Consideration offered by 3G Capital.

153. In the "**Risk Factors**" (emphasis in original) section of the Information Statement, Defendants stated that:

> The recent enactment of tariffs by the U.S. government, along with the unpredictability of the rates, ***poses a significant risk to Skechers' business operations and may materially increase Skechers' costs and reduce Skechers' margins***. The tariffs may also lead to higher pricing for Skechers' products, potentially reducing consumer demand and impacting Skechers' sales volume.

154. The section of the Information Statement titled "**Background of the Transaction**" (emphasis in original) made repeated references to 3G Capital's concerns about the impact the U.S.-China tariffs would have on Skechers' business operations and overall value. These statements gave the misleading impression that the tariffs were likely to cause a significant decline in Skechers' overall financial growth given its extensive operations in Asia and its reliance on trade with China.

155. The Information Statement describes an April 9, 2025 meeting between 3G Capital and Officer Defendants Weinberg and Vandemore to discuss the impact of the escalating U.S.-China trade tariffs. Specifically, the Information Statement represented that at this meeting:

> The parties discussed the growing structural uncertainty in Skechers' industry ***as a result of tariffs and global trade policies*** . . . [and] the ***potential long-term impacts that tariffs*** and such trade policies could have on the supply chain and product pricing and potential strategies for mitigating those tariffs.

156. Defendants made a similar representation in the Information Statement about the parties' meeting on April 13, 2025, during which 3G Capital made its "best-and-final" April 13 Offer. In describing the negotiations between Daniel Schwartz of 3G Capital and Defendant Vandemore during that meeting, Defendants stated that:

> On April 13, 2025, Daniel Schwartz had a meeting with John Vandemore in which Mr. Schwartz expressed concern about the ***significant potential impact that tariffs could have***, both in the near

> term and long term, on Skechers' business (which depends on a complex global supply chain, with a substantial portion of its products manufactured internationally and imported into the United States and other key consumer markets) and the broader consumer economy, the systematic increase in long-term risk associated with the uncertainty of tariff policy (including the impact of proposed or imposed tariffs by the United States government and retaliatory tariffs proposed or imposed by United States trading partners), the broader significant uncertainty in the global marketplace and additional concerning findings in 3G Capital's due diligence.

157. In describing 3G Capital's April 13 Offer that cut the proposed Merger Consideration by $10 per share from its March 12 Offer, Defendants represented in the Information Statement that:

> In presenting the [April 13 Offer], Mr. Schwartz communicated to Mr. Vandemore that, ***in light of the potentially significant short- and long-term adverse implications of tariffs on Skechers*** and the broader consumer economy, [among other factors] . . . the [April 13 Offer] reflected the maximum valuation of Skechers that 3G Capital was able to support.

158. Similarly, Defendants described an April 22, 2025 meeting between Officer Defendants Weinberg and Vandemore and the Board's outside directors (*i.e.*, Blair, Erlich, Garcia, Macias, and Siskind), during which "Skechers management updated the Skechers Board on the ***effect of tariffs on the Skechers business and long range plan*** and described the terms of the [April 13 Offer] from 3G Capital ***giving effect to the tariffs***."

159. Each of these statements was materially false because they gave the misleading impression that the U.S.-China trade tariffs would have a significant negative impact on Skechers' business, which together with the other reasons the Information Statement cited, including purported "concerning findings" in 3G Capital's due diligence and deterioration of the financing market, justified the $63 per share in cash Merger Consideration offered to Skechers shareholders. Contrary to the negative impression created by these statements, the Officer Defendants did

not view the U.S.-China tariffs as having a materially negative impact on Skechers' business prospects going forward. The Officer Defendants had in fact assured 3G Capital that any purported concerns about the impact of U.S.-China tariffs on Skechers' business and stock price were wholly overstated.

160. [redacted]

161. The Officer Defendants' assurances about the minimal impact global tariff increases would have on Skechers' business [redacted].

162. The Officer Defendants and 3G Capital also understood that Skechers was better positioned than its competitors to rapidly respond to any negative impact from the tariffs given the Company's lower price points. [redacted]

163. This information was not disclosed in the Information Statement or in Skechers' other public statements to unaffiliated shareholders.

**E. The Skechers Defendants Statements Concerning Strategic Alternatives and the Market Check Were Misleading**

164. The Skechers Defendants made statements regarding potential counterparties, the Independent Committee's mandate, and the market check that were rendered misleading by the omission of material facts showing that a transaction with 3G Capital was not Skechers' only available option. In late March 2025, [redacted]

165. As noted above, [redacted]

166. In a March 27, 2025 [redacted] Skechers common stock closed at $57.80 per share on March 27, [redacted]

167. Rather than exploring this opportunity further, [redacted]

[redacted]

168. Public shareholders were never informed about a potentially valuable strategic transaction [redacted] or the fact that Defendant Vandemore affirmatively instructed Greenhill to ignore this strategic alternative in favor of the 3G Capital Take-Private.

169. The Skechers Defendants also failed to disclose that [redacted] that was not pursued as an alternative to 3G Capital. This was reflected in an undisclosed April 2025 Greenhill presentation presumably prepared in conjunction with Greenhill's analysis of a 3G Capital transaction.

170. Nor did the Skechers Defendants disclose that in April 2025, Greenhill analyzed [redacted] Despite the fact that Greenhill found [redacted], this potential strategic transaction was concealed from Skechers' public shareholders.

171. The Skechers Defendants also entirely omitted from the Information Statement or elsewhere that Michael and Robert Greenberg committed to engage with 3G Capital on an exclusive basis from the commencement of Take-Private discussions—thereby effectively foreclosing consideration of alternate bidders.

172. [redacted] Greenhill confirmed this in a presentation on April 30, 2025, where it informed the Skechers Board that it

understood "the Family Group has ***decided to engage with 3G on an exclusive basis*** with respect to a potential transaction."

173. Skechers' public shareholders were not told that the Greenbergs—Skechers' controlling shareholders and most senior executives—had effectively agreed to engage only with 3G Capital on a transaction.

174. The omission of these facts rendered misleading the Information Statement's discussion of potential counterparties, the Independent Committee's consideration of alternatives, and the market check on which the Board relied.

## VI. ADDITIONAL ALLEGATIONS OF SCIENTER

175. Scienter is alleged as to each Defendant individually, based on that Defendant's particular role, access to the relevant information, participation in the challenged conduct, and personal benefits from the Take-Private—not on generalized corporate knowledge or group pleading. Skechers and the Officer Defendants acted with scienter because they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated during the Class Period were materially false and misleading. These Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of those statements as primary violators of the federal securities laws.

176. Defendant Robert Greenberg acted with scienter individually. As Skechers' founder, CEO and Chairman, controlling shareholder, and signatory of the Information Statement, Robert Greenberg had direct authority over the Company's disclosures and the Take-Private process. He knew of the April 13 final offer, the April 23–27 downward revisions to the Company's projections, the higher LRP1-based DCF valuations, and the contrary internal assessment that tariffs would have minimal impact. He nonetheless approved the $63 transaction and the fairness disclosures while securing more than $1 billion in cash, approximately 17.8 million private LLC units, and continued service as CEO and Chairman.

177. Defendant Michael Greenberg acted with scienter individually. As Skechers' President, Board member, controlling shareholder, and a participant in the negotiations leading to the Take-Private, Michael Greenberg had direct access to the transaction terms, the tariff discussions, the manipulated projections, and the value of the Mixed Merger Consideration. He participated in the Board's approval of the transaction and authorized disclosures portraying the $63 price as fair despite knowing that the projections had been lowered after 3G Capital's final offer. He (together with his father and their respective trusts) received more than $1 billion in cash, as well as the Greenbergs' approximately 18 million private LLC units. He also maintained employment and control in the post-Take-Private Company.

178. Defendant David Weinberg acted with scienter individually. As Skechers' COO and a long-serving Board member, Weinberg personally negotiated with 3G Capital, attended the April 22 meeting with the outside directors, and attended the April 30 meeting at which Greenhill presented the lowest projections and DCF range. He knew that the public explanation attributed the reduced offer to tariffs even though management had assured 3G Capital that tariff effects could be offset, and he knew that the LRP1-based valuations were not presented to the Independent Committee. Weinberg exchanged 192,961 shares for Mixed Merger Consideration and received more than $17 million in cash.

179. Defendant John Vandemore acted with scienter individually. As Skechers' CFO, [redacted] He also personally negotiated with 3G Capital regarding the April 13 offer and knew that the tariff narrative contradicted management's assurances that tariffs could be offset. Vandemore therefore knew that the "Skechers Management Projections" were manufactured to

support the $63 price, yet he authorized their use in the Fairness Opinion and Information Statement. He received millions of dollars in transaction-related compensation, including accelerated equity, and retained his position as CFO.

180. Defendant Katherine Blair acted with scienter individually. Blair attended the April 22, 2025 meeting at which Weinberg and Vandemore described the April 13 offer as “giving effect to the tariffs,” and the April 30 meeting at which management, Greenhill and Latham discussed the Mixed Merger Consideration, the April 27 LRP2 Projections, and Greenhill’s lower DCF range. Blair thus knew that the projections had been reduced after 3G Capital’s final offer yet failed to ask whether any prior projections or valuations existed, and was reckless in not knowing that the higher LRP1-based valuations had been withheld, but approved the fairness representations without making the inquiries those representations implied.

181. Defendant Morton Erlich acted with scienter individually. Erlich attended the April 22, 2025 meeting concerning the tariff explanation for the reduced offer, and the April 30 meeting at which Greenhill presented the April 27 LRP2-based valuation and the terms of the insider-favorable Mixed Merger Consideration. He knew, or was reckless in not knowing, that the Committee had not been shown Greenhill’s higher LRP1-based DCF analyses and nevertheless authorized the fairness disclosures as an informed and independent assessment.

182. Defendant Zulema Garcia acted with scienter individually. Garcia attended the April 22, 2025 meeting at which management linked the reduced offer to tariffs, and the April 30 meeting at which the Board received the manipulated April 27 LRP2 Projections and the corresponding lower DCF range. Garcia thus knewthat the projections had been successively reduced after 3G Capital’s final offer yet failed to ask whether any prior projections or valuations existed, and was reckless in not knowing that the higher LRP1-based valuations had been withheld,

but approved the fairness representations without making the inquiries those representations implied.

183. Defendant Yolanda Macias acted with scienter individually. Macias attended the April 22, 2025 meeting at which management linked the reduced offer to tariffs, and the April 30 meeting at which the Board received the manipulated April 27 LRP2 Projections and the corresponding lower DCF range. Macias thus knew that the projections had been reduced after 3G Capital's final offer yet failed to ask whether any prior projections or valuations existed, and was reckless in not knowing that the higher LRP1-based valuations had been withheld, but approved the fairness representations without making the inquiries those representations implied.

184. Defendant Richard Siskind acted with scienter individually. Siskind attended the April 22, 2025 meeting at which the outside directors were told that the April 13 offer gave effect to tariffs, and the April 30 meeting at which the Independent Committee received the April 27 LRP2-based DCF range and reviewed the Mixed Merger Consideration. Siskind knew, or was reckless in not knowing, that Greenhill's higher LRP1-based DCF analyses were not presented and that the projections had been lowered after the final offer, but nevertheless authorized the fairness disclosures.

185. The Independent Committee Defendants had actual access to the disputed information. As long-serving directors who participated in meetings about an important corporate transaction where the projections, tariff impacts, DCF analyses and consideration structure were presented, it is not necessary to rely on generalized corporate knowledge to infer that each Defendant knew the information contradicting the fairness statements.

186. In addition, the Officer Defendants knowingly and intentionally manipulated Skechers' financial projections downward to justify the inadequate

Merger Consideration offered to unaffiliated shareholders. These actions demonstrate that the Officer Defendants knew facts contradicting their claims of "fairness," which were withheld from the market and from Skechers' unaffiliated public shareholders.

187. Defendants Alexandre Behring and Daniel Schwartz acted with scienter individually. Each was a co-managing partner of 3G Capital and Behring personally participated in the February 19 and March 12 meetings, and Schwartz personally participated in those meetings and in the March 24, April 13 and April 21, 2025 negotiations, during which they knew of the Officer Defendants' internal tariff assurances, used the tariff narrative to reduce the proposed price, and set the terms of the rollover, exclusivity and Mixed Merger Consideration arrangements. 3G Capital and Fund VI also acted with scienter through their investment and negotiating personnel, who conducted the Merger due diligence, and presented the tariff and valuation information to the 3G IC. These Defendants benefitted from paying an inadequate price for Skechers' shares and from inducing shareholders to forgo appraisal; had more shareholders sought fair value through appraisal, 3G Capital and Fund VI would have been required to pay more.

188. The Officer Defendants had specific, personal and quantifiable motives to participate in the deception. Robert and Michael Greenberg received more than $1 billion in cash and 18 million private LLC units whose value, upon information and belief, was materially greater than the $63 cash consideration paid to public shareholders; a lower public price increased the value of the consideration and equity stake they obtained from 3G Capital. They also maintained their employment and operational and governance control after closing. Weinberg exchanged 192,961 shares for more than $17 million in cash, and Vandemore received millions of dollars in transaction-related compensation, including accelerated equity, while retaining his position. As owners of the post-Take-Private

Company, the Officer Defendants also benefited indirectly because, by underpaying public shareholders, 3G Capital retained more capital to invest in the private Company. These benefits were tied to the deflated price and the structure of the Take-Private, not merely to generic interests in completing a merger.

189. Skechers acted with scienter because the scienter of the Officer Defendants is imputed to the Company. Each of those Defendants spoke on behalf of and controlled the false and misleading materials disseminated to Skechers' unaffiliated public shareholders concerning the Take-Private.

190. Defendants Ahmed and Greenhill acted with scienter. It is reasonably inferred that these Defendants conveyed to the Officer Defendants that the projections provided would not support a DCF indicating that the cash Merger Consideration was fair. Ahmed and Greenhill knew that the revised projections provided to them by the Officer Defendants were not accurate or were at least highly suspicious because they were hastily prepared soon after the Officer Defendants were advised that the prior projections would not support a fairness opinion. Ahmed and Greenhill knew that the Fairness Opinion would be used to induce shareholders to forgo appraisal and to forgo electing the Mixed Merger Consideration. Greenhill and Ahmed were motivated to participate in the scheme to maintain their lucrative relationships with the Officer Defendants, to appease 3G Capital, and to avoid drawing scrutiny from courts and regulators that might jeopardize the Take-Private and the substantial contingent fee that Greenhill was set to, and ultimately did, receive.

## VII. PRESUMPTION OF RELIANCE

191. At all relevant times, the market for Skechers Class A common stock was efficient for the following reasons, among others:

a) Skechers Class A common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b) According to Skechers' Form 10-Q for the Second Quarter of 2025, Skechers had 130,962,336 shares of Class A common stock outstanding as of July 30, 2025 that were eligible for trading on the NYSE;

c) As a regulated issuer, Skechers filed periodic public reports with the SEC;

d) Skechers regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the internet, and other wide-ranging public disclosures; and

e) Unexpected material news about Skechers was rapidly reflected in and incorporated into the price for Skechers Class A common stock during the Class Period.

192. As a result of the foregoing, the market for Skechers Class A common stock promptly digested current information regarding Skechers and the Take-Private from publicly available sources and reflected that information in the stock price. Skechers' Class A common stock traded on the NYSE, a highly efficient and automated market, and the challenged statements were disseminated through SEC filings and press releases—including the April 24, 2025 Form 8-K and earnings release, the May 5, 2025 transaction announcement, and the August 5, 2025 Information Statement—that were rapidly incorporated into the market price. Under these circumstances, all sellers of Skechers common stock during the Class Period suffered similar injury through their sales of Skechers common stock at artificially deflated prices, and a presumption of reliance applies.

193. To the extent any claim under Count III rests on Defendants' deceptive conduct rather than affirmative statements, a presumption of reliance is also appropriate under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972). Count I rests on affirmative misstatements and half-truths, not pure omissions.

## VIII. LOSS CAUSATION

194. Each category of challenged statement independently caused Plaintiff and the Class to suffer the specific loss alleged here: selling or exchanging Skechers Class A common stock at a price artificially below its true value. The statements concerning the guidance withdrawal, Merger fairness and Company projections, tariffs, concealed alternatives, and the rollover/Mixed Merger Consideration each supplied a separate mechanism by which the market was deprived of material value information and the price of Skechers Class A common stock was deflated.

195. The guidance-withdrawal misstatement independently caused loss. On April 24, 2025, Defendants falsely attributed Skechers' withdrawal of its 2025 guidance to tariffs and macroeconomic uncertainty rather than to the ongoing take-private negotiations and the effort to justify 3G Capital's predetermined price. That false attribution created market fear that tariffs threatened Skechers' revenue, margins and growth, and the stock price fell from a $50.49 closing price on April 24 to a $47.79 closing price on April 25 after the disclosure. Had Defendants not withdrawn guidance, or disclosed that the withdrawal was being used in connection with an impending take-private and was not based on a genuine deterioration in Skechers' prospects, the market would have recognized 3G Capital's interest in acquiring Skechers as a signal that the Company was worth more than its depressed trading price. The false tariff explanation therefore caused Plaintiff and Class members to sell at prices below the prices their shares would have commanded absent the misstatement.

196. The misstatements concerning Merger fairness and Company projections independently caused loss by anchoring the market to an artificially low valuation. [redacted] By contrast, the

manipulated projections presented as the "Skechers Management Projections" produced a DCF range of only $51.60 to $68.20 per share, with a midpoint of approximately $59.90, and the April 30 presentation reflected a $51.61 to $68.21 range with a $59.91 midpoint. Defendants' omission of the LRP1 analyses and presentation of the manipulated range made the $63 Merger Consideration appear fair and caused market participants to value Skechers Class A common stock below the value supported by the ordinary-course projections. Had the true projections and DCF analyses been disclosed, the market would have recognized that Skechers' shares warranted a materially higher price, including a value above $63, and Plaintiff would not have sold or exchanged shares at artificially low prices.

197. The tariff misrepresentations independently caused loss. Defendants told the market that tariffs posed a significant risk, could materially increase costs and reduce margins, and justified 3G Capital's $10-per-share reduction in its offer. Internally, however, the Officer Defendants told 3G Capital that tariffs would have minimal impact: [redacted] By overstating tariff risk while concealing those internal assurances, Defendants caused market participants to discount Skechers' revenue, margins and growth prospects and thereby deflated the stock below its true value. Disclosure of the true tariff information would have supported a higher stock price and prevented Plaintiff and the Class from selling at artificially reduced prices.

198. The concealment of alternative transactions independently caused loss. Defendants concealed Greenhill's analysis [redacted]

[redacted] By presenting the 3G Capital Take-Private as the only viable strategic option and concealing the Greenbergs' exclusive arrangement with 3G Capital, Defendants prevented the market from recognizing that Skechers had value-enhancing alternatives and bargaining leverage beyond the $63 offer. Those omissions caused the market to undervalue Skechers Class A common stock and caused Plaintiff and the Class to sell or exchange shares at prices below the value that would have been reflected if the alternatives had been disclosed.

199. The rollover and Mixed Merger Consideration misstatements independently caused loss and are directly connected to the security Plaintiff held. The Skechers allegations concern the value of the same Class A common stock that Plaintiff owned and sold or exchanged. The Mixed Merger Consideration was made available as an alternative form of consideration to all holders of that Class A common stock, subject to the disclosed cap, eligibility and proration mechanics, and the misstatements about the value of the $57 cash plus equity-unit consideration affected how all Class A shareholders valued their shares. By concealing that the equity component and the overall consideration were worth materially more than represented, Defendants caused the market to value the Class A shares below their true value and induced Plaintiff to accept the inadequate $63 Merger Consideration or sell in the market at a deflated price. The causal connection is therefore between the misstatement and the very Class A common stock Plaintiff held, not a fundamentally different security.

200. All of the challenged statements and omissions here were made before Plaintiff sold or exchanged its shares. The guidance withdrawal statements preceded the Class sales, and the fairness, projection, tariff, alternative-transaction and rollover misstatements were made in the Information Statement before the September 5, 2025 election deadline and September 12, 2025 closing. No challenged rollover or other statement post-dates Plaintiff's sale or exchange.

201. Plaintiff also adequately alleges loss through the forfeiture of appraisal rights. This is not a speculative assertion that any appraisal recovery might exceed the Merger Consideration. [redacted]. Those contemporaneous valuations, [redacted] and the evidence that the projections were manipulated downward to reach $63, support the specific allegation that the fair value of the shares exceeded the Merger Consideration. The concurrent Delaware appraisal proceeding and shareholder litigation are proceeding on the basis that the $63 Merger Consideration was unfair and undervalued Skechers' Class A common stock. Skechers offered dissenting shareholders $65 per share to settle their appraisal demands (according to reporting published in May 2026) and subsequently settled with numerous such shareholders in the appraisal proceedings. Had the true valuation information been disclosed, Plaintiff and Class members would have preserved and exercised appraisal rights rather than surrendering them for an inadequate price.

202. Thus, each challenged category independently satisfies loss causation: each statement or omission concerned information that would have supported a higher value for the same Skechers Class A common stock, each operated to deflate the market price or the consideration received, and each foreseeably caused Plaintiff and the Class to sell or exchange their shares for less than their true value. In the alternative, the coordinated scheme independently operated as a fraud and deceit that induced Plaintiff and the Class to sell or exchange at those artificially depressed prices and forfeit appraisal rights. The absence of a separate corrective disclosure does not defeat these allegations because the economic loss occurred when Plaintiff sold or exchanged at a price lower than the price that would have prevailed had the specific misstatements and omissions not been made.

## IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

203. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pled in this Complaint. To the extent certain statements alleged to be materially false or misleading may be characterized as forward-looking, the statutory safe harbor does not apply because those statements were made in connection with a going-private transaction. *See* 15 U.S.C. § 78u-5(b)(1)(E).

204. In any event, the statements alleged to be materially false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

205. To the extent the statutory safe harbor applies to any forward-looking statements pled herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge or recklessly disregarded that the particular forward-looking statement was materially false or misleading. Defendants are liable for the statements pled because, at the time each of those statements was made, Defendants knew or recklessly disregarded the statement was false, and the statement was authorized and/or approved by the Officer Defendants who knew or recklessly disregarded that such statement was false when made.

## X. CLASS ACTION ALLEGATIONS

206. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class") consisting of all sellers of Skechers Class A common stock from April 24, 2025 through September 12, 2025, inclusive, including those who exchanged their shares in the Take-Private. Excluded from the Class are Defendants, the officers and directors of Skechers, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

207. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Skechers Class A common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are at least several thousand members in the proposed Class. Record owners and members of the Class may be identified from records maintained by Skechers or its transfer agent or the depository bank for the Class A stock and may be notified of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

208. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' materially false and misleading statements, omissions of material facts, and conduct in violation of federal law that is asserted herein.

209. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

210. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) Whether the Exchange Act was violated by Defendants as alleged herein;

b) Whether statements made by Defendants misrepresented material facts about the Take-Private as well as the business, operations and valuation of Skechers;

c) Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

d) Whether the price of Skechers common stock was artificially deflated during the Class Period;

e) Whether Defendants' material misstatements and omissions of material fact caused members of the Class to sustain damages; and

f) The extent of damages sustained by Class members and the proper measure of damages.

211. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this Action as a class action.

## XI. CLAIMS FOR RELIEF

### COUNT I

### For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5(b) Against the Skechers Defendants

212. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

213. This Count is asserted on behalf of all members of the Class against Skechers, the Independent Committee Defendants and the Officer Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5(a)-(c).

214. During the Class Period, these Defendants made materially false and misleading statements and half-truths that were intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class Members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to sell Skechers Class A common stock at artificially deflated prices into the open market or exchange them in the Take-Private and forfeit their appraisal rights during the Class Period.

215. These Defendants made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; in an effort to maintain artificially deflated market prices for Skechers Class A common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

216. Skechers and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to disseminate the misleading statements and conceal material information about the Company, its operations and prospects, as well as material information concerning the Take-Private.

217. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

218. In their roles as senior executives of Skechers during the Class Period, the Officer Defendants directly participated in the management of Skechers' operations and, because of their positions at Skechers, were involved in the drafting, reviewing, publishing and/or disseminating of the materially false and misleading statements and information alleged herein, and possessed the power and authority to control the contents of Skechers' Class Period misstatements and omissions in connection with the Take-Private. The Information Statement was in fact signed by Defendant Robert Greenberg as Board Chairman and CEO of Skechers, and was issued to shareholders "[o]n behalf of the Board." The April 24, 2025 Form 8-K was signed by Defendant Vandemore.

219. Each of the Officer Defendants authorized the dissemination of the Information Statement, the use of their names in the Information Statement, and were involved in the sale process leading up to the signing of the Merger Agreement. Each of the Independent Committee Defendants directed and acquiesced in the publication of the Information Statement and the attribution to them of the opinion that the Take-Private was "fair to and in the best interests" of unaffiliated shareholders. Thus, all Defendants named in this Count knowingly and substantially participated or acquiesced in the issuance or dissemination of those statements as primary violators of the federal securities laws.

220. Defendants' omissions and false and misleading statements issued during the Class Period are material in that a reasonable Skechers shareholder would view a full and accurate disclosure as significantly altering the total mix of information made available by Defendants and in other information reasonably available to Skechers shareholders.

221. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with

their respective sales or exchanges of the Company's Class A common stock during the Class Period.

222. By virtue of the foregoing, the Defendants named in this Count violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**

**For Violation of §20(a) of the Exchange Act**

**Against the Officer Defendants**

223. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

224. This Count is asserted on behalf of all members of the Class against the Officer Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), based on the primary Section 10(b) and Rule 10b-5(b) violations specifically alleged in Count I. Those primary violations include the Officer Defendants' false and misleading statements and omissions concerning the guidance withdrawal, manipulated projections and fairness opinion, tariffs, strategic alternatives, and Mixed Merger Consideration, together with the loss causation allegations above.

225. By reason of their high-level positions of control and authority, participation in, awareness of, direct control of, and supervisory involvement in Skechers' day-to-day operations during the Class Period, each Officer Defendant had actual power to control and influence Skechers' decisions and the conduct giving rise to the primary violation. Robert Greenberg was CEO and Chairman, a controlling shareholder, and the signatory of the Information Statement; Michael Greenberg was President and a Board member; David Weinberg was COO and a Board member who negotiated the transaction; and John Vandemore was CFO who supplied and revised the projections and directed Greenhill's treatment of strategic

alternatives. Each had the power to control the Company's disclosures and the challenged conduct, and each exercised that power through the negotiations, projection process, Board approvals, and dissemination of the Information Statement. The Officer Defendants therefore were able to and did influence and control, directly and indirectly, the content and dissemination of the materially false and misleading statements and omissions alleged in Count I. They also had a duty to disseminate accurate and truthful information regarding the Take-Private and Skechers' valuation and to correct previously issued statements that had become untrue.

226. As a direct and proximate cause of the Officer Defendants' wrongful conduct as set forth herein, Plaintiff and other members of the Class suffered compensatory damages during the Class Period.

227. Because Plaintiff has adequately alleged the primary Section 10(b) and Rule 10b-5(b) violations in Count I, and because each Officer Defendant exercised actual power and control over Skechers and the primary violative conduct, the Officer Defendants, together and individually, are liable as controlling persons pursuant to Section 20(a) of the Exchange Act, jointly and severally.

## COUNT III

**For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5(a) and (c) (Scheme Liability) Against the Officer Defendants, Behring, Schwartz, 3G Capital Partners L.P., 3G Fund VI, L.P., Ahmed and Greenhill**

228. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

229. Prior to, and during, the Class Period, the Officer Defendants, the Greenhill Defendants, Ahmed, and the 3G Capital Defendants carried out a plan, scheme and course of conduct that was intended to and, throughout the Class Period,

did: (i) deceive the investing public, including Plaintiff and other Class Members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to sell Skechers Class A common stock at artificially deflated prices into the open market or to exchange them in the Take-Private, and to forfeit their appraisal rights during the Class Period.

230. These Defendants employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the sellers of Skechers Class A common stock in an effort to maintain artificially deflated market prices for Skechers Class A common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder. Defendants here engaged in deceptive conduct beyond merely disseminating misstatements, including manipulating projections, concealing strategic alternatives and exclusivity, and structuring the Mixed Merger Consideration to divert value to insiders. Liability attaches to each Defendant's participation in that scheme regardless of whether the Defendant drafted or made a particular statement, because each Defendant's own deceptive acts independently furthered the fraud.

231. The scheme to deflate the price of Skechers' publicly traded stock and deceive Skechers' unaffiliated public shareholders into selling their stock and not seeking appraisal involved specific deceptive conduct beyond the misstatements themselves, including:

- the downward revisions of projections by the Officer Defendants and Greenhill's uncritical acceptance and use of these revised projections;
- the concealment and discounting of business prospects involving [redacted] by the Officer Defendants and Greenhill;

- the issuance by Greenhill of a false and misleading Fairness Opinion to justify the Take-Private at the direction of the Officer Defendants;
- the concealment of the Greenbergs' exclusive arrangement with 3G Capital;
- the inducement by 3G Capital of the Officer Defendants to deflate the price of Skechers stock and the Merger Consideration using promises of post-Take-Private employment, acceleration of vesting of restricted equity, and demands that insiders roll over their shares and maintain exclusivity;
- Greenhill's concealment of the true value of the Mixed Merger Consideration; and
- 3G Capital's structuring of the Take-Private generally and the Mixed Merger Consideration in particular to: (a) incentivize the Officer Defendants to negotiate a low price; (b) conceal that the equity component was more lucrative than the $63 cash consideration; (c) funnel insiders into the more valuable consideration; and (d) prevent non-insiders from electing the Mixed Merger Consideration even if they recognized its superior value.

232. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective sales or exchanges of the Company's Class A common stock during the Class Period.

233. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT IV

**For Violation of §20(a) of the Exchange Act**

**Against Behring and Schwartz**

234. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

235. This Count is asserted on behalf of all members of the Class against Defendants Behring and Schwartz for violations of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), based on the primary Section 10(b) and Rule 10b-5(a) and (c) scheme-liability violations specifically alleged in Count III. Those primary violations include the manipulation of projections, concealment of strategic alternatives and exclusivity, dissemination of the false Fairness Opinion and other disclosures, and structuring of the Mixed Merger Consideration to divert value to insiders.

236. Behring and Schwartz had actual power and control over 3G Capital's conduct giving rise to the primary scheme violation. Each was a co-managing partner of 3G Capital. Behring personally participated in the February 19 and March 12, 2025 meetings with the Officer Defendants, and Schwartz personally participated in those meetings and in the March 24, April 13 and April 21, 2025 negotiations. At those meetings they set or communicated the terms of the offers, used the tariff narrative to reduce the proposed price, required rollover and exclusivity arrangements, and determined the structure of the Mixed Merger Consideration. Their positions and direct participation gave them power to control 3G Capital's decisions and the acts that furthered the fraudulent scheme, and they exercised that power to influence the primary violators and the contents and dissemination of the transaction disclosures.

237. As a direct and proximate cause of these Defendants' wrongful conduct as set forth herein, Plaintiff and other members of the Class suffered compensatory damages during the Class Period.

238. Because Plaintiff has adequately alleged the primary Section 10(b) and Rule 10b-5(a) and (c) scheme-liability violations in Count III, and because Behring

and Schwartz exercised actual power and control over 3G Capital and the primary scheme participants, Behring and Schwartz, together and individually, are liable as controlling persons pursuant to Section 20(a) of the Exchange Act, jointly and severally.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a) Declaring this Action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c) Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and expert witness fees and other costs; and

d) Awarding such other relief as deemed appropriate by the Court.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this complaint so triable.

DATED: October 21, 2026

*/s/ Krysta Kauble Pachman*

**SUSMAN GODFREY L.L.P.**
Marc M. Seltzer
Krysta Kauble Pachman
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel.: (310) 789-3100
Fax.: (310) 789-3150
mseltzer@susmangodfrey.com
kpachman@susmangodfrey.com

**ENTWISTLE & CAPPUCCI LLP**
Vincent R. Cappucci (*pro hac vice* forthcoming)
Robert N. Cappucci (*pro hac vice forthcoming*)

Jonathan H. Beemer (*pro hac vice* forthcoming)
Brendan J. Brodeur (*pro hac vice* forthcoming)
230 Park Avenue, 3rd Floor
New York, NY 10169
Tel.: (212) 894-7200
vcappucci@entwistle-law.com
rcappucci@entwistle-law.com
jbeemer@entwistle-law.com
bbrodeur@entwistle-law.com

-and-

Andrew J. Entwistle (*pro hac vice forthcoming*)
500 W. 2nd Street, Suite 1900
Austin, TX 78701
Tel.: (512) 710-5960
aentwistle@entwistle-law.com

*Counsel for Plaintiff SM Merger/Arbitrage, L.P.*

**CERTIFICATION**

I, Salvatore Muoio, on behalf of S. Muoio & Co. LLC, hereby certify, as to the claims asserted under the federal securities laws in the Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint"), that:

1. I am the Managing Member of S. Muoio & Co. LLC, the general partner and investment advisor of SM Merger/Arbitrage, L.P. ("SM Merger/Arbitrage") and have the authority to execute this certification on its behalf. I have reviewed the Complaint in this action and have authorized its filing by counsel.

2. SM Merger/Arbitrage did not acquire any of the securities that are the subject of this action at the direction of its counsel, or in order to participate in this action or any other litigation under the federal securities laws.

3. SM Merger/Arbitrage is willing to serve as lead plaintiff in this action, and recognizes its duty as such to act on behalf of class members in monitoring and directing the action, and, if necessary, testifying at deposition and trial.

4. SM Merger/Arbitrage will not accept any payment for serving as a representative party on behalf of the class beyond its *pro rata* share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court.

5. SM Merger/Arbitrage has not served or sought to serve as a representative party for a class in any action filed under the federal securities laws within the three-year period prior to the date of this Certification except in: (i) *In re Emisphere Technologies, Inc. Securities Litigation*, No. 2:23-cv-20898 (D.N.J. 2023) (where SM Merger/Arbitrage served as a lead plaintiff); and (ii) *In re Cerevel Therapeutics Holdings, Inc. Sec. Litig.*, No. 1:25-cv-00417-GBW (D. Del. 2025) (where SM Merger/Arbitrage currently serves as a lead plaintiff).

6. All of SM Merger/Arbitrage's transactions during the relevant period in Skechers U.S.A., Inc. securities that are the subject of this action are reflected in Schedule A hereto.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6 day of October 2026.

SM Merger/Arbitrage, L.P.
By: Salvatore Muoio
Managing Member of S. Muoio & Co. LLC, General Partner and Investment Advisor of SM Merger/Arbitrage, L.P.

**Schedule A**

**SM Merger/Arbitrage, L.P.**
**Transactions in Skechers U.S.A., Inc. Common Stock**
**Class Period: April 24, 2025 - September 12, 2025 (Merger Closing)**

| Trade Date | Transaction | Shares | Price |
|---|---|---|---|
| 6/13/2025 | Purchase | 3,500 | $ 62.5300 |
| 6/18/2025 | Purchase | 2,100 | $ 62.4492 |
| 6/25/2025 | Purchase | 3,850 | $ 62.8387 |
| 6/26/2025 | Purchase | 7,000 | $ 62.8458 |
| 7/1/2025 | Purchase | 7,700 | $ 63.0640 |
| 7/16/2025 | Purchase | 4,291 | $ 63.0530 |
| 8/8/2025 | Purchase | 2,100 | $ 62.9650 |
| 8/26/2025 | Purchase | 4,459 | $ 62.9890 |
| 9/12/2025 | Sale - Merger Closing | 35,000 | |